# UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

| | |
|---|---|
| Frank Leet, Administrator of the Estate of Nicholas Leet, and Stephanie Leet, Individually and as Next Friend of Minor Child, Heidy Leet, | |
| *Plaintiffs*, | **Case No. 23-cv-_____** |
| v. | **COMPLAINT** |
| AW Distributing, Inc., AW Product Sales & Marketing, Inc., Falcon Safety Products, Inc., and Norazza, Inc. | **DEMAND FOR JURY TRIAL** |
| *Defendants*. | |

TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   PARTIES ........................................................................................................... 10

III.  JURISDICTION & VENUE ............................................................................... 12

IV.   FACTS .............................................................................................................. 13

   A.   Nick Leet's death .......................................................................................... 13

   B.   The emergence of computer dusters as the most commonly abused inhalant – the data
   reveals a public health crisis ............................................................................... 14

      1. The National Survey on Drug Use and Health ............................................. 14

      2. The National Poison Data System ............................................................... 16

      3. The National Electronic Injury Surveillance System ..................................... 20

      4. Though Curated for the Benefit of Computer Duster Manufacturers, Media Reports
      Collected and Posted by the Alliance for Consumer Education Further Demonstrate the
      Scope of the Huffing Problem ......................................................................... 22

      5. Locally enacted bans on sales of computer duster ........................................ 24

   C.   Huffing and the addictive nature of DFE – a deadly combination ..................... 24

   D.   The numbers of deaths attributed to huffing are significant and rising ............. 31

   E.   Ultra Duster, Dust-Off and Endust – content of the duster cans and subsequent addition
   of bitterant due to foreseeable use as an inhalant. ................................................ 33

   F.   DB is ineffective at deterring huffing and may increase the risks of huffing .......... 44

      1. DB — A bitter denaturant used to prevent accidental poisoning ..................... 44

      a. DB has not been added at the necessary concentration to deter abuse ............. 46

      b. Differences between accidental ingestion and intentional ingestion ................ 47

      c. Other considerations make DB an improper bitterant in this application ......... 50

   G.   Independent tests show that DB is not present in the quantity Defendants represent or at
   the threshold level of detectability to most human subjects .................................... 51

V.    CLAIMS FOR RELIEF ..................................................................................... 54

      COUNT I: STRICT PRODUCTS LIABILITY – DESIGN DEFECT ..................... 54

      COUNT II:  STRICT PRODUCTS LIABILITY – FAILURE TO WARN ............... 58

      COUNT III:  NEGLIGENT DESIGN DEFECT ................................................. 62

      COUNT IV:  NEGLIGENT FAILURE TO WARN ............................................ 65

      COUNT V:  WRONGFUL DEATH................................................................... 70

      COUNT VI: SURVIVORSHIP ........................................................................ 71

      COUNT VII: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY ....... 72

      COUNT VIII:  BREACH OF EXPRESS WARRANTY ...................................... 72

Plaintiffs Frank Leet, Administrator of the Estate of Nicholas Leet, and Stephanie Leet, individually, and as Next Friend of Minor Child, Heidy Leet, for their complaint against AW Distributing, Inc., AW Product Sales & Marketing, Inc. (collectively "AW" or "AW Defendants"), Falcon Safety Products, Inc. ("Falcon Safety Products" or "Falcon"), and Norazza, Inc. ("Norazza") allege as follows:

## I.    INTRODUCTION

1.    Inhalant abuse is a rampant yet underreported public health crisis in the United States. A recent national survey found that 2.4 million people aged 12 and over reported using inhalants in 2020 alone. Of these individuals, 215,000 are estimated to have an inhalant abuse disorder.[1] Yet, inhalant abuse has been termed "the forgotten epidemic."[2]

2.    Inhalants are extremely toxic to the human body and can have profound effects on the nervous system and other organs.[3] Scientific research has shown that prolonged use can cause neurological damage, resulting in cognitive abnormalities and permanent brain damage.[4] Chronic exposure to these toxins can also cause damage other organs and bodily systems, particularly to the heart, lungs, liver, and kidneys.[5]

---

[1] SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION, *Key Substance Use and Mental Health Indicators in the United States: Results from the 2020 National Survey on Drug Use and Health*, at 16, 27-29 and Table A.26B (www.samhsa.gov/data). *See also*, NATIONAL INSTITUTE ON DRUG ABUSE, *How Are Inhalants Used?*, April 13, 2020, at 4.

[2] Carter Sherman, Inhalants – *The Easy to Acquire but Deadly Drug That Nobody Talks About*, HOUSTON PRESS, Sept. 6, 2016, at 3.

[3] NATIONAL INSTITUTE ON DRUG ABUSE, *What are the Other Medical Consequences of Inhalant Abuse?*, May 20, 2022, at 8-10, https://nida.nih.gov/publications/research-reports/inhalants/what-are-other-medical-consequences-inhalant-abuse.

[4] *Id*.

[5] *Id*.

3.      Despite carrying such extreme physiological risks, including death, the chemicals used in some categories of inhalants would seem innocuous to the average person. They may be colorless, odorless, and tasteless. Yet looks can be deceiving. These are highly addictive substances that can cause catastrophic injury, including brain damage or death, even to a first-time user.

4.      Moreover, inhalants are relatively inexpensive to manufacture and thus highly accessible as a means to get intoxicated. Gram for gram, inhalants may be the cheapest, easiest, and one of the fastest ways for a user to get "high," and these products can be purchased, in bulk, at the local hardware store, office supply store, grocery store or, in some cases, even the gas station.

5.      The most common cause of death from inhalants is cardiac arrest.

6.      Inhalants cause the heart to beat at an abnormal rate, known as cardiac arrhythmia, which also increases the heart's sensitivity to the hormone adrenaline. The body releases adrenaline as a response to stress. For a person intoxicated on inhalants, any sudden rush of fear, excitement, or surprise could result in cardiac arrest.[6]

7.      Another common cause of death from inhaling is known as Sudden Sniffing Death Syndrome, which occurs when the gas component of aerosol blocks the body's normal flow of oxygen, also leading to cardiac arrest.[7]

---

[6] R.T. Shepherd, *Mechanism of Sudden Death Associated With Volatile Substance Abuse*, 8 HUMAN TOXICOLOGY 287, 287-291 (1989). *See also*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2794702/#:~:text=Cardiac%20arrest%20%E2%80%93C hemicals,to%20inhalant%20abuse.

[7] www.drugrehab.com/addiction/drugs/inhalants/sudden-sniffing-death-syndrome/.



8.    Huffing injuries and deaths also contribute to motor vehicle accidents and drownings due to the user being intoxicated while driving or being near water.[8]

9.    Computer dusters are one of the most accessible and frequently abused inhalants. Dusters are intended to remove lint and debris from computer keyboards and peripheral equipment. However, they are composed almost entirely of 1-1, Difluoroethane (DFE), an odorless gas listed as HFC-152a. When inhaled, DFE causes intense and immediate intoxication. The intoxication is also short-lived and undetectable in workplace drug tests, which makes dusters a prime target for abuse. Huffing DFE also results in a loss of motor control and impaired judgment, leading to numerous accidents or death.

10.    Dusters are cheap and readily available at most big-box and small retailers. Three manufacturers – AW, Falcon Safety Products, and Norazza – dominate the U.S. retail duster market. Upon information and belief, they are responsible for selling over ***100 million DFE dusters every year*** – the bulk of which are sold to individuals seeking to get high, thus feeding a growing public health crisis.

---

[8] Janet F. Williams, et al, *Inhalant Abuse*, 119 J. Am. Acad. of Pediatrics 1009, 1009-1017 (2007), available at www.pediatrics.org/cgi/doi/10.1542/peds.2007-0470.

11.     Defendants' computer dusters cost as little as $1.89 per can. All are available in multipacks and do not feature warnings about inhalant addiction or guidance to prevent inhalant abuse. Defendants have worked to ensure that dusters continue to be sold without regard to purchaser's age and without restriction on number of cans purchased.

12.     AW designs, manufactures, tests, labels, markets, and distributes Ultra Duster. Ultra Duster is AW's trademark brand name.



13.     AW also private labels Ultra Duster on behalf of third parties. AW contracts with these third parties and, according to its website, places the third-party company's name on cans of Ultra Duster or redesigns the Ultra Duster cans to reflect the third party company's name or logo. Among the third-party brands that AW manufactures are Innovera and the Office Depot duster. These dusters are identical in composition to Ultra Duster.




14.    Falcon Safety Products designs, manufactures, tests, labels, markets, and distributes Dust-Off. Dust-Off is Falcon's trademark brand name.



15.    Recently, Falcon has introduced a second brand, Blow Off, which is also believed to be a Falcon trademark brand name and identical in composition to Dust Off.



16.    Similar to AW, Falcon Safety Products also private labels its flagship brand Dust-Off on behalf of third parties. Among the third-party brands Falcon manufactures are Century Duster, Maxell, and Insignia. These dusters are identical in composition to Dust-Off.

  

17.    Norazza designs, manufactures, tests, labels, markets, and distributes Endust. Endust is Norazza's trademark brand name.



18.    Similar to AW and Falcon Safety Products, Norazza also private labels its flagship brand Endust on behalf of third parties. Among the third-party brands Norazza manufactures is Surf onn., a duster private labeled exclusively for Walmart. This duster is identical in composition to Endust.



19.     AW previously private labeled Surf onn. for Walmart. The composition of the can, the can design, and the purported warnings on the can are virtually the same despite Walmart transitioning from AW to Norazza as its private-label partner.

20.     Each of the computer dusters manufactured by AW, Falcon Safety Products, and Norazza are identical in composition – all are composed almost entirely of DFE and contain a trace amount of a bitterant known as denatonium benzoate ("DB").

21.     Defendants and their private-label retail partners are complicit in creating the public health crisis of inhalant abuse as they are aware of the extremely addictive nature of DFE yet continue to promote these cheap computer dusters for easy consumption by individuals addicted to huffing who frequent stores again and again purchasing multipacks on each visit.

22.     Defendants fail to provide a warning that inhaling DFE is extremely addictive, which increases the risk of injury and death to inhalant users. And they falsely warrant that a bitterant was added which would help deter inhalant abuse.

23.     To avoid liability for injuries or death due to inhalant abuse, Defendants and their retail private-label partners have included the bitterant denatonium benzoate ("DB") in their cans of computer duster. Indeed, Defendants' big box retail partners began to require the addition of bitterant to the product due to the increase in inhalant misuse. However, the inclusion of DB and

Defendants' touting of it as solving the problem of abuse is misleading, deceptive, fraudulent, and unreasonably dangerous for multiple reasons.

24.     First, by design, the DB has no meaningful impact in the manner and quantity in which it is added to Defendants' dusters as it is undetectable in the gas vapor phase. And, even if added in the quantity which Defendants have claimed, it would never trigger an actual deterrent effect upon an inhalant misuser. To date, no scientific report provides evidence that DB deters inhalant abuse. Notably, even the industry has not been able to sponsor any studies to such an effect.

25.     As evidence of the failure of DB as a deterrent, huffing-related injuries and deaths have increased exponentially after addition of the bitterant to these cans.[9]

26.     Second, Defendants and their retail private-label partners are aware that DB is among a class of bitter substances, including saccharin, which a significant portion of the population cannot detect. Namely 15-30% of the adult population has a genetic trait which renders them incapable of detecting the bitter taste of certain molecules.[10] Defendants fail to provide a warning that its bitterant could be undetectable in inhalant misuse scenarios.

27.     Finally, and perhaps most damning to Defendants' promises regarding the deterrent effect of the bitterant, DB is a bronchodilator which relaxes muscles in the lungs and widens the inhalant abuser's airways. As a result, DB ***increases*** the amount of DFE which the inhalant abuser might otherwise absorb into their lungs while huffing. This operates to make huffing the duster

---

[9] Mathias B. Forrester, *Computer and Electronic Duster Spray Inhalation (Huffing) Injuries Managed at Emergency Departments*, 46 AM. J. DRUG ALCOHOL ABUSE 180, 180–183 (2020).

[10]  U.S. CONSUMER PRODUCT SAFETY COMMISSION, FINAL REPORT: STUDY OF AVERSIVE AGENTS 18 (1992).

even riskier and more dangerous than it otherwise would be absent the bitterant.[11] To date, no industry or scientific report provides evidence that DB deters inhalant abuse.

28.    Yet, despite these known problems with DB, Defendants and their retail private-label partners warrant on each of their duster cans that the added bitterant will help to deter or discourage inhalant abuse, as shown in the images below. This warranty is false, intentionally misleading, and increases the danger to consumers.



*Figure 1 - Ultra Duster warranty*



*Figure 2 - Dust-Off warranty*

---

[11]  Brian E. Perron et al., *Potentially Serious Consequences for the Use of Bitrex as a Deterrent for the Intentional Inhalation of Computer Duster Sprays*, 39 FORENSIC TOXICOLOGY 286 (2021), available at http://link.springer.com/10.1007/s11419-020-00559-2.



*Figure 3- Endust warranty*

29.     When an individual passes away from cardiac arrest or Sudden Sniffing Death Syndrome attributed to huffing their official cause of death is generally termed "difluoroethane toxicity." This was Nicholas Leet's official cause of death after he was found him unconscious in a motel with empty cans of Surf onn nearby.

30.     Leading up to his death, Nicholas (known as "Nick" to his family) routinely huffed products manufactured by each of the Defendants. He visited numerous retailers on a weekly and sometimes daily basis to feed his addiction. Thus, each of the Defendants played a role in causing his deadly addiction and subsequent death.

31.     Nick's death, and the deaths of many others, could have been avoided had Defendants not negligently and defectively designed, tested, labeled, marketed, and distributed their dusters knowing that: (1) DFE is extremely addictive and required a warning of its addictive nature due to the foreseeable misuse of huffing; (2) the addition of DB did not deter the foreseeable misuse, (3) a significant portion of the population cannot taste DB in any quantity, and (4) the inclusion of DB in any amount presented a greater risk to the foreseeable misuse.

## II.    PARTIES

32.     Plaintiff Frank Leet is an adult resident citizen of Johnson County, Kansas. Frank Leet is decedent Nick Leet's father and has been appointed Administrator of Nick's estate. Frank Leet is hereafter referred to as "Plaintiff Leet" or "Mr. Leet".

33.     Plaintiff Stephanie Leet is an adult resident citizen of Jackson County, Missouri. Stephanie Leet is decedent Nick Leet's surviving spouse and mother of his minor daughter, Heidy Leet. Stephanie Leet is hereafter referred to as "Plaintiff Stephanie Leet" or "Ms. Leet."

34.     Defendant AW Distributing, Inc. ("AW Distributing") is a California-registered corporation with its principal place of business at 204 E. 2nd Ave., Unit 343, San Mateo, California 94401. It may be served through its registered agent, Kennic Ho, at the same address.

35.     Defendant AW Product Sales & Marketing, Inc. ("AW Product Sales") is a California-registered corporation with its principal place of business at 204 E. 2nd Ave., Unit 343, San Mateo, California 94401. It may be served through its registered agent, Kennic Ho, at the same address.

36.     At all material and relevant times, AW Defendants designed, manufactured, tested, labeled, marketed and distributed Ultra Duster and private label versions of Ultra Duster, including but not limited to Innovera and Office Depot dusters, for sale and use in the United States including within the State of Kansas.

37.     Defendant Falcon Safety Products, Inc. is a New Jersey Corporation with its principal place of business at 25 Imclone Drive, Branchburg, New Jersey 08876. At all material and relevant times, Falcon designed, manufactured, tested, labeled, marketed and distributed Dust-Off, Blow Off, and private label versions of these dusters, including but not limited to Century Duster, Maxell and Insignia dusters, for sale and use in the United States including within the State of Kansas.

38.     Defendant Norazza, Inc. is a New York Corporation with its principal place of business at 3938 Broadway, Buffalo, New York 14227. At all material and relevant times, Norazza designed, manufactured, tested, labeled, marketed and distributed Endust and private label

versions of Endust, including but not limited to Surf onn. for Walmart, for sale and use in the United States including within the State of Kansas.

### III.   JURISDICTION & VENUE

39.   <u>Subject Matter Jurisdiction</u>.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) and (c), because the amount in controversy exceeds $75,000, exclusive of interest and costs, and Plaintiffs are diverse from Defendants.

40.   <u>Personal Jurisdiction</u>.  The Court has personal jurisdiction over AW, Falcon, and Norazza because Defendants regularly conduct business in the State of Kansas, sold their computer dusters in the State of Kansas, and actively sought to serve the market for their computer duster products in the State of Kansas. All of the Defendants designed, marketed, manufactured, tested, labeled, and distributed their duster products for nationwide sale and consumption including to some of the largest national retailers – none sought to avoid distribution and sale in Kansas. Each sold millions of duster cans every year including large numbers in Kansas. In addition, Defendants committed tortious acts in the State of Kansas and Plaintiffs' claims arise out of such acts, and/or because each of the Defendants otherwise made or established contacts in the State of Kansas sufficient to permit the exercise of personal jurisdiction.

41.   <u>Venue</u>.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this action occurred in this judicial district, namely Defendants sold their respective computer dusters through representatives and resellers located in this judicial district, Nick (whose death gave rise to the claims in this action) purchased computer dusters from representatives and resellers located in this judicial district, Nick died of difluoroethane toxicity in this judicial district and resided in this judicial district at the time of his death, Nick's estate was established and is administered in this district, and Plaintiff Frank Leet resides in this judicial district. Further, AW, Falcon, and Norazza through

their representatives and resellers, marketed, distributed, and sold their respective computer dusters—which were essentially identical in all material respects—to millions of consumers across the United States, including in the District of Kansas.

## IV.    FACTS

### A.    Nick Leet's death

42.    Nick began huffing computer duster in approximately 2016 after being introduced to the immediate and intense intoxication from huffing DFE. Inhalant abuse quickly took over Nick's life.

43.    Nick served in the Navy, where he received training in aviation mechanics, and attended college before pursuing training to become an electrician. Ultimately, Nick's addiction spiraled out of control leading to him losing employment, losing friendships, and ultimately to criminal arrests and homelessness.

44.    His family intervened and encouraged Nick to seek treatment through outpatient and, ultimately, inpatient rehab. Yet, Nick continued to suffer from intense cravings and lasting effects of withdrawal from DFE, which included irritability, insomnia, aggression, and mood disorder.

45.    In January 2021, Nick completed inpatient rehab. During this period, he succeeded in finding new employment outside of Kansas. He continued intensive outpatient rehab after starting his new job. However, he relapsed in February 2021 and lost his job yet again after resuming huffing.

46.    On the evening of March 7, 2021, Nick's body was found by hotel staff at a Quality Inn next door to Walmart. The police report and scene investigation found 45 cans of Surf onn. in the hotel room near his body. He was pronounced dead on March 7, 2021. His death certificate lists "difluoroethane toxicity" as his cause of death. He was 34 years old.

47.     Nick was known to abuse Dust Off, Blow Off, Ultra Duster, Office Depot branded duster, and Surf onn. Each of the dusters used by Nick contributed to his addiction to DFE and his subsequent death.

**B.     The emergence of computer dusters as the most commonly abused inhalant – the data reveals a public health crisis**

**1.     The National Survey on Drug Use and Health**

48.     Nick is not alone. The National Survey on Drug Use and Health ("NSDUH"), administered annually by the Substance Abuse and Mental Health Services Administration, found that 678,000 Americans initiated inhalant use in 2020.[12] Inhalants outpaced cocaine, sedatives, methamphetamine, and heroin as the choice of substance for first-time abuse.[13]

49.     This statistic is not surprising considering that cocaine, methamphetamine, and heroin are illegal and sedatives are a controlled substance, while most inhalants are neither illegal nor controlled. Computer dusters, in particular, are inexpensive, readily available, and there are no controls on frequency of purchase or number of cans per purchase.

50.     In terms of overall inhalant use, the 2020 NSDUH found that among those individuals aged 12 or older, 2.4 million people used inhalants.[14] This figure is up 400,000 from the 2018 National Survey, representing *a whopping 20% increase over a two-year period*.[15]

51.     NSDUH did not include dusters as a discrete inhalant type in its survey until 2015. Prior to 2015, the survey only asked if individuals had abused any "other" products and relied

---

[12] NSDUH is an authoritative source for epidemiological data on tobacco, alcohol, and drug use; mental health; and other health-related issues in the U.S. This survey is conducted in all 50 states and in the District of Columbia. *See* SUBSTANCE ABUSE & MENTAL HEALTH SERVICES ADMINISTRATION, U.S. DEPT. HEALTH & HUMAN SERVICES, KEY SUBSTANCE USE & MENTAL HEALTH INDICATORS IN THE UNITED STATES: RESULTS FROM THE 2020 NATIONAL SURVEY ON DRUG USE & HEALTH 25 (Oct. 2021).

[13] *Id.* at 23-25.

[14] *Id.* at 16.

[15] *Id.* at 17.

upon the individual to recall computer dusters. When individuals were specifically asked whether they had abused computer dusters, a more accurate picture of huffing emerged – an exponential increase compared to the prior method of estimating. As shown below, including dusters in the "other" category resulted in grossly underestimating the prevalence of huffing dusters.[16]



### 2.  The National Poison Data System

52.     Data from the National Poison Data System ("NPDS") of the National Poison Control Center also shows alarming increases in duster use and resulting injury or death. A scientific study published in 2010 in the American Academy of Pediatrics found that while some types of inhalant use—such as sniffing gasoline or paint—have been declining since 1993, use of propellants like dusters has skyrocketed since 2003.[17]



53.     NPDS is a data warehouse for 55 poison control centers across the U.S. The results from this study involved human cases with an exposure route of inhalation with intentional use as a reason. Intentional use or misuse was defined as "an exposure resulting from the intentional,

---

[17] Melinda R. Marsolek, Nicole C. White & Toby Litovitz, *Inhalant Abuse: Monitoring Trends by Using Poison Control Data*, 1993-2008, 125 PEDIATRICS 906, 906-913 (May 2010), available at https://publications.aap.org/pediatrics/article-abstract/125/5/906/72520/Inhalant-Abuse-Monitoring-Trends-by-Using-Poison?redirectedFrom=fulltext.

improper or incorrect use of a substance where the victim was likely attempting to achieve a euphoric or psychotropic effect."[18]

54.     An expert review of the NPDS data found that for the period of 1993 through 2008, the overall number of inhalant-related calls to poison control decreased by 33%. Yet, while there was a general decline in inhalant misuse, there was a significant increase in use of propellants, with computer dusters being far and away the most commonly used propellant.[19]

55.     To further illustrate the emergence of computer dusters as the drug of choice for inhalant users, Melinda Marsolek and her colleagues provided a breakdown of the 25 most frequently implicated inhalant products. According to this research, computer dusters ranked the 7th most fatal inhalant product, ranked 3rd by all major effects, 4th by death, and 8th on the overall hazard index.[20]

---

[18] *Id.*

[19] *Id.*

[20] *Id.*

The 25 Most Frequently Implicated Products Ranked According to Fatality Rate for All Single-Substance Cases

| Product | All | Major Effects | Deaths | Hazard Index[a] | Fatality Rate[b] |
|---|---|---|---|---|---|
| All substances | 30 094 | 705 | 167 | 29.0 | 5.5 |
| Butane | 620 | 19 | 36 | 88.7 | 58.1 |
| Propane | 270 | 9 | 7 | 59.3 | 25.9 |
| Air fresheners | 1239 | 22 | 27 | 39.5 | 21.8 |
| Nitrous oxide | 731 | 18 | 10 | 38.3 | 13.7 |
| Carburetor cleaners | 582 | 43 | 5 | 82.5 | 8.6 |
| Fluorocarbons/freon | 1631 | 59 | 14 | 44.8 | 8.6 |
| Dusters | 2457 | 69 | 13 | 33.4 | 5.3 |
| Nitrites/nitrates | 431 | 16 | 2 | 41.8 | 4.6 |
| Toluene/xylene | 1096 | 48 | 5 | 48.4 | 4.6 |
| Adhesive/glue | 1105 | 18 | 4 | 19.9 | 3.6 |
| Hair spray | 279 | 2 | 1 | 10.8 | 3.6 |
| Disinfectants | 347 | 4 | 1 | 14.4 | 2.9 |
| Polishes/waxes | 350 | 5 | 1 | 17.1 | 2.9 |
| Paint thinner | 458 | 14 | 1 | 32.8 | 2.2 |
| Typewriter correction fluid | 566 | 4 | 1 | 8.8 | 1.8 |
| Paint | 3036 | 80 | 5 | 28.0 | 1.6 |
| Gasoline | 4329 | 72 | 7 | 18.2 | 1.6 |
| Helium | 689 | 9 | 1 | 14.5 | 1.5 |
| Formalin/formaldehyde | 197 | 6 | 0 | 30.5 | 0.0 |
| Deodorant | 302 | 3 | 0 | 9.9 | 0.0 |
| Ethanol (nonbeverage) | 233 | 2 | 0 | 8.6 | 0.0 |
| Albuterol | 415 | 1 | 0 | 2.4 | 0.0 |
| Marker/ink | 419 | 1 | 0 | 2.4 | 0.0 |
| Nail polish remover | 182 | 0 | 0 | 0.0 | 0.0 |
| Nail polish | 160 | 0 | 0 | 0.0 | 0.0 |

[a] The hazard index was calculated as the number of cases that resulted in major effects or death per 1000 cases.
[b] The fatality rate was calculated as the number of cases that resulted in death per 1000 cases.

56.    Another notable finding by Marsolek's study was the change in prevalence of propellants over four years by state—from 2002-2004 to 2006-2008. The data broken down by state showed a ***300% increase in total calls*** regarding propellants from 2003 to 2008. 47 states reported an increase, 14 states reported an exponential increase, and no states reported a decrease

18

in total number of calls. And, again, the vast majority of these calls were attributed to use of computer duster.[21]



Change in prevalence of propellant cases according to state, A, 2002–2004 vs B, 2006–2008.

---

[21] *Id.*

57.    Importantly, this data does not capture the full scope of computer duster use as some addicts seek treatment at acute care facilities, may succumb to cardiac arrest or Sudden Sniffing Death Syndrome, or forego treatment.

### 3.    The National Electronic Injury Surveillance System

58.    Data from the National Electronic Injury Surveillance System ("NEISS") is another resource which proves that the frequency of huffing has increased to the point of becoming a public health crisis.

59.    NEISS is a database maintained by the U.S. Consumer Product Safety Commission which catalogs injuries treated at a broad sampling of 100 hospital emergency departments which have at least 6 beds and 24-hour emergency care. Experienced coders review this data from emergency room ("ER") visits and enter demographic, injury, and treatment information into NEISS database.[22] This database represents the core of the CPSC's Bureau of Epidemiology. A 2020 study by Mathias Forrester, published in the American Journal of Drug and Alcohol Abuse, used data from NEISS to estimate the number of ER visits due to misuse of removers for the period 2001-2017.[23] Brian E. Perron, PhD, a Professor at the University of Michigan, updated Forrester's findings through 2018 and included other inhalant types for comparison. The data shows that computer dusters account for more visits than all other categories of inhalants combined.

---

[22] https://www.cpsc.gov/es/Research--Statistics/NEISS-Injury-Data

[23] Mathias B. Forrester, *Computer and electronic duster spray inhalation (huffing) injuries managed at emergency departments* 46 AM. J. DRUG ALCOHOL ABUSE 180, 180-183 (2020).



60. Overall, according to the analysis of NEISS records by Dr. Perron and Mr. Forrester, computer dusters accounted for more ER visits than any other inhalant on an annual basis from 2011-2018.[24] Specifically, dusters account for 16,927 out of a total of 30,095 inhalant-related ER visits—56.2% of all inhalant-related ER visits.

---

[24] *Id.*



**4.** **Though Curated for the Benefit of Computer Duster Manufacturers, Media Reports Collected and Posted by the Alliance for Consumer Education Further Demonstrate the Scope of the Huffing Problem**

61.    The Alliance for Consumer Education is a non-profit organization which was formed in 2000 by the Household and Commercial Products Association, a trade organization heavily supported by several of the Defendants.[25]

62.    ACE operates as a clearinghouse for media reports concerning inhalation abuse and purports to offer common sense suggestions to prevent inhalant abuse. For example, ACE offers a

---

[25] https://www.consumered.org/

tool kit including an inhalant abuse quiz and lesson plan for teachers about the dangers of inhalant abuse.[26]

63.     While ACE does report some data on the prevalence of inhalant abuse, its website makes no effort to track deaths attributed to huffing computer dusters. Indeed, its website states: "[T]he number of lives claimed by inhalant abuse each year is unknown because these deaths often are attributed to other causes."[27] ACE makes no mention of the fact that acute 1,1-Difluoroethane intoxication is a cause of death specifically due to huffing DFE, or that data tracking the number of annual deaths from this particular category is available upon request to individual medical examiners' offices.

64.     Nonetheless, a review of the media reports and press information ACE has curated is consistent with the fact that huffing DFE is addictive and is a foreseeable use of computer dusters. Specifically, Brian E. Perron, PhD, analyzed the reports available on ACE's website through 2020 and found 1,012 reports of inhalant abuse attributed to computer dusters. This number far exceeded the reports attributed to all other types of inhalants combined.



---

### 5. **Locally enacted bans on sales of computer duster**

65.    Indeed, issues related to huffing have also led to local bans on the sale of dusters. Specifically, the small town of Bald Knob, Arkansas, population approximately 3,000, passed an ordinance in late 2020 banning the sale of computer dusters within city limits.[28]

66.    Police Chief Larry House reports that prior to the ban, the police were receiving 5-8 calls per week related to huffing. After the ordinance was passed instituting a ban, the huffing-related calls went to zero.

67.    The nearby town of Pangburn, Arkansas is reportedly considering instituting a similar ordinance banning sales of computer dusters.[29]

68.    Taken as a whole, this evidence points to an alarming increase in huffing which has impacted even some of the smallest communities in the U.S. Clearly, huffing DFE has risen to the level of being a public health crisis.

### C.    **Huffing and the addictive nature of DFE – a deadly combination**

69.    According to the National Institute of Drug Abuse ("NIDA"), "addiction" is chronic, relapsing disorder characterized by compulsive drug seeking, continued use despite harmful consequences and long-lasting changes in the brain. "Abuse" is defined as misusing a substance to get high.

---

[28] https://www.thedailycitizen.com/news/bald-knob-council-approves-banning-sale-of-air-duster-if-city-legally-can/article_ae0ccf7d-6f38-5474-8399-d7df401415d2.html?utm_medium=social&utm_source=email&utm_campaign=user-share. *See also*, https://www.thedailycitizen.com/news/bald-knob-goes-through-with-ban-on-sale-of-air-duster-products/article_3ed7df37-1a25-5146-9204-19d9fd19f1ee.html.

[29] https://www.thedailycitizen.com/news/pangburn-watching-bald-knobs-duster-ban/article_53297891-adee-5f4a-9c31-71c100839517.html.

70.     If a person compulsively misuses computer dusters and meets the Diagnostic and Statistical Manual of Mental Disorders ("DSM") criteria for inhalant use disorders, as shown below, the person would be assigned this disorder with a DFE specifier.

*Table 1- Criteria for the diagnosis of inhalant use disorders from the 5th version of the Diagnostic and Statistical Manual of the American Psychiatric Association (DSM-5)*

Diagnostic Criteria

A. A problematic pattern of use of a hydrocarbon-based inhalant substance leading to clinically significant impairment or distress, as manifested by at least two of the following, occurring within a 12-month period:

1. The inhalant substance is often taken in larger amounts or over a longer period than was intended.

2. There is a persistent desire or unsuccessful efforts to cut down or control use of the inhalant substance.

3. A great deal of time is spent in activities necessary to obtain the inhalant substance, use it, or recover from its effects.

4. Craving, or a strong desire or urge to use the inhalant substance.

5. Recurrent use of the inhalant substance resulting in a failure to fulfill major role obligations at work, school, or home.

6. Continued use of the inhalant substance despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of its use.

7. Important social, occupational, or recreational activities are given up or reduced because of use of the inhalant substance.

8. Recurrent use of the inhalant substance in situations in which it is physically hazardous.

9. Use of the inhalant substance is continued despite knowledge of having a persistent or recurrent physical or psychological problem that is likely to have been caused or exacerbated by the substance.

10. Tolerance, as defined by either of the following:

   a. A need for markedly increased amounts of the inhalant substance to achieve intoxication or desired effect.

   b. A markedly diminished effect with continued use of the same amount of the inhalant substance.

*Specify* **the particular inhalant:** When possible, the particular substance involved should be named (e.g., "solvent use disorder").

71.     Per NIDA, a substance is considered addictive if: (1) the substance impacts the brain's circuitry; and (2) changes produce compulsive use despite harmful consequences.

72.     At least 12 case studies support the broad consensus that DFE is highly lipophilic, crosses the blood-brain barrier, directly affects the central nervous system, stimulates the gamma-aminobutyric acid ("GABA") receptors, and inhibits the N-methyl-D-aspartate ("NMDA") receptors. These studies indicate that DFE meets the first element for being an addictive substance.

| Causal Explanation from Case Reports of Intoxication from DFE |
|---|
| "This refrigerant, used as a propellant in spray cans, is believed to exert its psychoactive effects by stimulating the GABA receptors and by inhibiting the NMDA receptors; other studies suggest that inhalants promote the release of dopamine in specific brain areas (Kurniali et al., 2012; Garland and Howard, 2012; Bass, 1970; Jevtovic-Todorovic et al., 1998 )..."[30] |
| "DFE is a central nervous system (CNS) depressant associated with a brief sensation of euphoria when inhaled. Prolonged or excessive use is associated with toxicity, and abrupt cessation can induce withdrawal ... DFE acts as a CNS depressant via glutamate and γ-aminobutyric acid receptors, causing a brief euphoria when inhaled."[31] |
| "Hydrocarbon inhalants rapidly access the central nervous system because of their lipophilicity. Here, these inhalants stimulate gamma-aminobutyric acid (GABA) receptors, causing inhibition in the central nervous system similar to the effects of ethanol. This can cause euphoria, disorientation, agitation, and impaired judgment. Because euphoria is often experienced, difluoroethane abuse is associated with patients presenting with anhedonia and other depressive symptoms, much like the patient of this case. It provides a rapid high which in turn dissipates within a matter of minutes, making it both highly desirable and highly dangerous for its abusers."[32] |
| The sought after euphoria or "high" can also be accompanied by central nervous system depression due to the extreme lipophilic properties of the gas and increased gamma-aminobutyric acid type A receptor affinity.[33] |
| "This compound has a high degree of lipophilicity which, when inhaled, crosses the blood brain barrier causing a state of euphoria and CNS depression. Serious toxicity from acute exposure is almost always from deliberate abuse or occupational exposure in a confined space, either from dysrhythmia or simple asphyxia from displacement of oxygen."[34] |
| Inhaled DFE accumulates in high levels in the brain, causing euphoria, intoxication, and confusion.[35] |
| Dust Off [sic] contains 1,1-difluoroethane, a halogenated hydrocarbon that works similarly to other abused inhalant products. Inhalation avoids hepatic first-pass metabolism, and as a result generates high CNS concentrations and rapid onset of intoxication: euphoria, disinhibition, confusion, and in some cases obtundation.[36] |
| "It is known that they depress the central nervous system by stimulating γ-aminobutyric acid receptors and inhibiting N-methyl-D-aspartate receptors. Other studies suggest that inhalants causes in key regions of the brain."[37] |
| Like other volatile hydrocarbons, difluoroethane is lipophilic and quickly crosses the blood-brain barrier with immediate CNS effects. Peak blood concentrations occur 10-20 seconds after inhalation.  The euphoric high that results from inhaling or "huffing" difluoroethane can last for 15-30 minutes. Clinical presentation varies and depends on dose and exposure time[38]. |

[30] Ermelinda Levari et al., *The Dangerous Use of Inhalants Among Teens: A Case Report*, 1 EMERGING TRENDS IN DRUGS, ADDICTIONS, AND HEALTH 100006, at 2 (2021).

[31] Adam Custer, Andrew Corse & Sondra Vazirani, *Difluoroethane Inhalant Abuse, Skeletal Fluorosis, and Withdrawal*, 37 FED. PRACTITIONER 288–289 (2020).

[32] Clara B. Novotny, Sarah Irvin & Eduardo D. Espiridion, *Acute Psychosis Following 1,1-Difluoroethane Inhalation*, 11 CUREUS e5565, at 2 (2019).

[33] Erika L. Faircloth, Jose Soriano & Deep Phachu, *Inhalation of 1-1-difluoroethane: A Rare Cause of Pneumopericardium*, 10 CUREUS e3503, at 1 (2018).

[34] Mohan Punja, Dennis Bradley Langston & Maurice Walter Smith, *Cryogenic Dermal Injuries to the Chest Secondary to Inhalational Abuse of Keyboard Cleaner*, 56 CLINICAL TOXICOL. 672, 672 (2018).

[35] Eric Cohen et al., *Rapid-Onset Diffuse Skeletal Fluorosis from Inhalant Abuse: A Case Report*, 4 JBJS CASE CONNECT e108, at 4 (2014).

[36] Kristen Calhoun et al., *Inhaling Difluoroethane Computer Cleaner Resulting in Acute Kidney Injury and Chronic Kidney Disease*, 2018 CASE REPORTS IN NEPHROLOGY 4627890 (2018).

[37] Peter C. Kurniali et al., *Inhalant abuse of computer cleaner manifested as angioedema*, 30 AM. J. EMERGENCY MED. 265.e3, 265.e3-4 (2012).

[38] C. Clinton Frazee et al., *Two Fatalities Involving 1,1-difluoroethane*, TOXICOLOGY CASES FOR THE CLINICAL AND FORENSIC LABORATORY 401, 402 (Hema Ketha & Uttam Garg, eds., 2020), available at https://linkinghub.elsevier.com/retrieve/pii/B9780128158463000806 (last visited Apr 25, 2021).

| |
|---|
| As a halogenated hydrocarbon, 1,1-difluoroethane is well absorbed via the lung, and rapidly distributed to organs with high fat content such as brain. Due to its high blood gas partition coefficient, the onset of effects with inhalation of this substance can be as rapid as an intravenous injection although the peak effects may be delayed because of slower tissue diffusion."[39] |
| Inhalation of volatile hydrocarbons rapidly distributes them throughout the body, producing a quick "high" within seconds to minutes.[40] |
| The majority of hydrocarbons started their therapeutic use as anesthetics. The mechanism of action associated with the euphoria and disinhibition associated with hydrocarbon abuse is thought to involve N-methyl-d-asparate (NMDA) antagonism and/or gamma aminobutyric acid (GABA) stimulation. 2 The NMDA receptor type that appears to be the most sensitive to solvents is also the most prevalent form in the brain during adolescence."[41] |

73.    Regarding the second element, "compulsive use" refers to a pattern of consumption that is stimulus-bound (*i.e.*, the person is seeking a reward), stereotyped (*i.e.*, repeated acts over time), and difficult to control.[42] "Harmful consequences" refers to disruptions in primary role functions in life (*e.g.*, relationships, employment, education) and negative impacts on a person's physical, mental, or emotional health.

74.    Real world case reports shows that DFE's impact on the brain leads to compulsive use with harmful consequences:

---

[39] Zhenggang Xiong, Joseph Avella & Charles V. Wetli, *Sudden Death Caused by 1,1-difluoroethane Inhalation*, 49 J. FORENSIC SCI. 627 (2004).

[40] H. Evan Dingle & Saralyn R. Williams, *Multi-Organ System Injury from Inhalant Abuse*, 23 PREHOSPITAL EMERGENCY CARE 580, 581 (2019).

[41] Kathryn T. Kopec et al., *ACMT Toxicology Visual Pearls: I'll Huff and I'll Puff…*, ALiEM (2020), https://www.aliem.com/huffing/.

[42] S. T. Tiffany and B. L. Carter, *Is Craving the Source of Compulsive Drug Use?*, J. PSYCHOPHARMACOLOGY (Oxford, England), Vol. 12(1), 23-30 (1998). https://doi.org/10.1177/026988119801200104

| Narratives from Published Case Studies of Compulsive Behaviors Related to Huffing |
|---|
| Inhalation of 16 cans of Dust-off [sic] in a single episode, including daily use for a few weeks[43] |
| Medical visit preceded by inhalation of 10 cans of Dust-off [sic] in a single episode[44] |
| Patient reported abusing a computer dust removal product "Dust Off" [sic] daily for the past 2 years. On day of presentation, he inhaled 10 cans[45] |
| Patient suffered a relapse and used 8 cans of Dust-Off® per day for 2 weeks[46] |
| Patient started to inhale this product 8 times daily for 7 years[47] |
| Patient self-reported a 6-month history of inhaling 20-25 cans of DFE per day[48] |
| Patient was inhaling DFE every day, going through multiple 300 mL cans daily[49] |
| Patient reported abusing 9 to 11 cans daily for the previous 11 months[50] |
| Patient had been huffing up to 10 canisters daily for a period of 9 months[51] |
| Patient stated that the last thing he remembered was "huffing" 6-10 cans of the computer cleaning product, Dust-Off[52] |
| Patient admitted to an "inhalational binge" with at least 6 cans of this product over the past 3 days[53] |
| He admitted to huffing 2-7 cans of air dust cleaner on a weekly basis for 3 years[54] |

[43] A Sidlak et al., *Severe cardiotoxicity and hypocalcemia from chronic inhalation of 1,1-difluorethane*, 57 CLINICAL TOXICOL. 1036 (2019).

[44] M. Patel et al., *Pneumomediastinum, acute kidney injury, rhabdomyolysis, and cryogenic dermal injuries secondary to inhalation abuse of keyboard cleaner*, 15 J. MED. TOXICOL. 78 (2019).

[45] K. Orjuela & V. Patil, *Duster abuse: A recurrent spell*, 14 EPILEPSY CURRENTS 164–165 (2014).

[46] I. Honkanen et al., *An unlikely source of periostitis*, 33 J. GENERAL INTERNAL MEDICINE 464 (2018).

[47] A.K. Gupta & G.M. Chan, *Chronic Difluoroethane Abuse Associated Peripheral Neuropathy Treated Successfully with Gabapentin*, 47 CLINICAL TOXICOL. 715 (2009).

[48] Adam Custer et al., *Difluoroethane Inhalant Abuse, Skeletal Fluorosis, and Withdrawal*, 37 FED'L PRACTITIONER 288, 288 (2020).

[49] Shiliang A Cao, Madhab Ray & Nikolai Klebanov, *Air Duster Inhalant Abuse Causing Non-ST Elevation Myocardial Infarction*, 12 CUREUS e8402, at 2 (2020).

[50] Alex Ponce, Jennifer A. Oakes & William Eggleston, *Acute skeletal fluorosis in the setting of 1,1-difluoroethane abuse*, 57 CLINICAL TOXICOL. 374, 374 (2019).

[51] Regina Liu & Thomas Blair, *Skeletal Fluorosis and "Sniffer's Dermatitis" After Inhalant Abuse with 1,1-Difluroethane*, 23 PROCEEDINGS OF UCLA HEALTH (2019).

[52] Erika L. Faircloth, Jose Soriano & Deep Phachu, *Inhalation of 1-1-difluoroethane: A Rare Cause of Pneumopericardium*, 10 CUREUS e3503, at 2 (2018).

[53] Mohan Punja et al., *Cryogenic dermal injuries to the chest secondary to inhalational abuse of keyboard cleaner*, 56 CLINICAL TOXICOL. 672, 672 (2017).

[54] Katherine Peicher & Naim M. Maalouf, *Skeletal Fluorosis Due to Fluorocarbon Inhalation from an Air Dust Cleaner*, 101 CALCIFIED TISSUE INT'L 545, 545 (2017).

75.     Upon information and belief, the incidents described in each of these studies all occurred after Defendants introduced the bitterant DB into their computer dusters. Addition of a bitterant is discussed in Section E, *infra*.

76.     As demonstrated by the medical reports and studies excerpted above, compulsive behavior of inhaling DFE persisted despite very harmful consequences. Specifically, in addition to death from cardiac arrest or Sudden Sniffing Death Syndrome, the following medical conditions have been directly attributed to huffing DFE: (1) skeletal fluorosis/bone deformities; (2) bone fractures from falls; (3) motor vehicle crashes; (4) chemical burns, blisters and rashes; (5) dysrhythmia; (6) toxic myopericarditis; (7) ventricular fibrillation, tachycardia and other cardiac dysfunction; (8) acute kidney injury and failure; (9) pneumomediastinum; (10) dyspnea; (11) seizures; (12) loss of motor control; and (13) psychosis.[55]

77.     The non-profit organization Families United Against Inhalant Abuse ("Families United") also tracks and reports the various harmful effects of huffing DFE. Families United reports that, aside from causing death, huffing can lead to permanent brain damage, hearing loss, loss of smell, irregular heartbeat, liver damage, kidney damage, and bone marrow depression, as depicted on the following graphic.[56]

---

[55]  Clara B. Novotny, Sarah Irvin & Eduardo D. Espiridion, *Acute Psychosis Following 1,1-Difluoroethane Inhalation*, 11 CUREUS e5565 (2019).

[56] https://familiesunitedagainstinhalantabuse.org/our-story/effects-of-inhalant-abuse/



78.    Moreover, recent research shows that huffing DFE can lead to withdrawal psychosis.[57] Other studies have demonstrated that 47.8% of persons who met the criteria for inhalant dependence reported experiencing three or more inhalant-related withdrawal symptoms which were "clinically significant," a percentage nearly equivalent to the percentage of persons

---

[57] Adam Custer, et al., *Difluoroethane Inhalant Abuse, Skeletal Fluorosis, and Withdrawal, supra*, at 288-289.

with cocaine dependence who reported clinically significant cocaine withdrawal symptoms.[58] This data strongly indicates that DFE is highly addictive.

79.     The addictive nature of huffing DFE, combined with the risks it poses creates a scenario similar to Russian Roulette every time an abuser inhales DFE. Cardiac arrest or Sudden Sniffing Death can occur the first time a duster is inhaled and lead to immediate death.[59] Non-fatal yet permanent damage to various organs, including permanent brain damage, can also occur as described above.[60]

> **D.**     **The numbers of deaths attributed to huffing are significant and rising**

80.     The National Inhalant Prevention Coalition ("NIPC") reports that the number of inhalant-related deaths in the United States is approximately 100-125 people per year.[61] However, this number is incorrect and far below the actual number of deaths. As the executive director for the Alliance for Consumer Education explained in a newspaper, inhalant-related deaths are underreported because many are recorded as something else.[62] Other researchers concur.

81.     Families United also tracks death statistics attributed to DFE inhalation. Their report is grim. In Virginia, Florida, Los Angeles and San Diego Counties in California, 17 counties in Pennsylvania, and Travis County, Texas alone, they found a total of 1109 inhalant deaths from

---

[58] Brian E. Perron, et al, *The prevalence and clinical significance of inhalant withdrawal symptoms among a national sample*, 2 SUBSTANCE ABUSE AND REHABILITATION 69-76 (2011).

[59] M. Bass, *Sudden Sniffing Death*, 212 JAMA 2075–2079 (1970). *See also* A. Groppi et al., *A Fatal Case of Trichlorofluoromethane (Freon 11) Poisoning. Tissue Distribution Study by Gas Chromatography-Mass Spectrometry*, 39 J. FORENSIC SCI. 871, 871–876 (1994);  Xiong, *supra*,  at 627–629; J. Avella, et al., *Fatal cardiac arrhythmia after repeated exposure to 1,1-difluoroethane (DFE)*, 27 AM. J. FORENSIC MED. PATHOL. 58–60 (2006).

[60] https://familiesunitedagainstinhalantabuse.org/our-story/effects-of-inhalant-abuse/.

[61] https://www.nationaltasc.org/determine-death

[62]  Carter Sherman, Inhalants – *The Easy to Acquire but Deadly Drug That Nobody Talks About*, HOUSTON PRESS, Sept. 6, 2016.

2007 through 2019. Of these figures, an eye-popping *648 deaths* were attributed to DFE intoxication.[63]

82.     Perhaps the most compelling statistics on deaths attributed to DFE is from a clearinghouse maintained by the U.S. Consumer Product Safety Commission ("CPSC"). Since 2010, the CPSC clearinghouse data directly attributes over 2018 deaths to huffing computer duster.[64] The clearinghouse data reflects deaths in every state in the U.S., plus the District of Columbia and other U.S. territories. The CPSC data comes from death certificates and medical examiner and coroner reports, among other reliable sources. Upon information and belief, these numbers represent only the tip of the iceberg.

83.     These figures undercount deaths because the tests for DFE are not part of the typical battery of tests performed during an autopsy. Acute 1,1-Difluoroethane intoxication is determined using a volatile test, which evaluates toxicity of the decedent's blood. A femoral blood sample is submitted to a reference laboratory for 1,1-Difluoroethane using a gas chromatograph/mass spectrometer. But volatile testing for DFE is not part of the typical autopsy battery of tests. A case study co-authored by doctors at Children's Mercy Hospital, University of Missouri School of Medicine, and the Office of Jackson County Medical Examiner, all in Kansas City, Missouri, involving two deaths attributed to 1,1-Difluoroethane illustrates this problem. The authors write: "DFE is not typically included in routine postmortem toxicology screens and could be overlooked without appropriate scene investigation, case history and/or anatomical pathology findings."[65]

---

[63] https://familiesunitedagainstinhalantabuse.org/inhalent-deaths-in-us/

[64] https://www.cpsc.gov/Data

[65] Frazee, *supra*, at fn. 38.

This study and others like it have advocated for medical examiners to include volatile tests as part of routine autopsy screens to properly identify DFE-related deaths.

84.     Aside from undercounting DFE-related deaths during autopsies, there are also numerous bystanders killed each year as a direct result of DFE abuse. Many of these bystanders are killed by vehicles operated by individuals driving under the influence of DFE. Yet, their deaths are not always attributed to DFE abuse.

**E.     Ultra Duster, Dust-Off and Endust – content of the duster cans and subsequent addition of bitterant due to foreseeable use as an inhalant.**

85.     During all times relevant to this case, Defendants designed, tested, labeled, marketed, and distributed Ultra Duster, Dust-Off, and Endust and private label versions of each of them for sale across the United States, including in the State of Kansas and each of the other 49 states and territories.

86.     Upon information and belief, Norazza was responsible for designing, testing, labeling, marketing, and distributing the can of Surf onn. that killed Nick Leet.

87.     Defendants AW, Falcon, and Norazza are all responsible for contributing to Nick's huffing addition and death as substantial factors.

88.     In addition to being contributing causes of Nick's huffing addiction, market share liability should be imposed upon Defendants for the manufacture, sale, and/or distribution of nearly identical, fungible products that utilize the same chemical compound at the same or nearly the same concentration, which cause serious injury and death when used in an entirely foreseeable method of attaining immediate, intense intoxication, and are known to be highly addictive.

89.     Defendants contract with big box retailers across the United States and in the Kansas City, Missouri metropolitan area (which encompasses Johnson County, Kansas) to stock and sell their dusters to consumers, many of whom purchase the products in multiple quantities

and on a repeated basis to huff. To maximize profit, Defendants offer their dusters for sale in multi-packs of up to 12 or more cans for as little as $1.89 per can. Upon information and belief, a single can deliver up to 100 "hits" of DFE, making it among the cheapest and most readily available drugs.

90.    Upon information and belief, Defendants encourage resellers to prominently market their computer dusters on endcaps and near check out areas with prominent signage.

91.    Per the Safety Data Sheet, revision dated 12/2016, Surf onn. or ONN is comprised 100% of 1,1-Difluoroethane. This version of Surf onn.'s Safety Data Sheet was available on Walmart's website.

---

**Safety Data Sheet**

Page 1 of 9

Reviewed on: 12/2016

**1 Identification**

· **Product identifier:** ONA19HO053, ONA19HO054, ONA19HO055
· **Trade name:** ONN Electronics 10oz  Duster
· **Application of the substance / the mixture** Surface cleaning
· **Details of the supplier of the Safety Data Sheet**
· **Manufacturer/Supplier:**
Norazza, Inc.
3938 Broadway
Buffalo, NY 14227
Phone: (716) 706-1160
Website: www.norazza.com
· **Emergency telephone number:**
ChemTel Inc.
(800)255-3924, +1 (813)248-0585

---

**3 Composition/information on ingredients**

**Chemical characterization: Substances**
**CAS No. Description**
    75-37-6 1,1-difluoroethane 100%

---

92.     While this Safety Data Sheet claims the content is 100% DFE, Surf onn. cans also contain a trace amount of bitterant. Upon information and belief, the bitterant is only around .01% of each can.

93.     AW, Falcon, and Norazza publish very similar Safety Data Sheets for their trademark branded dusters.

94.     Defendants also place a warranty on the back of their dusters. AW and Falcon cans warrant: "Contains a bitterant to help discourage inhalant abuse." Norazza cans warrant: "Safety bitterant included to help discourage inhalant abuse." Pictures of the warranties are set forth in Section I. Introduction, *supra*.

95.     Numerous cases have been filed against Defendants and their retail partners, including Walmart, alleging wrongful death, products liability and related claims arising from inhalation of DFE.

96.     In one such case, *Michael Grieco et al. v. Amy Merrill et al.*, Walmart's corporate representative Joe Bussell testified that incidents of huffing dating back to 2008 led Walmart to request a bittering agent be added to computer duster products (at the time, AW rather than Norazza private-labeled Surf onn. for Walmart).[66]

---

[66] Joe Bussell Dep. 148:8-15, Oct. 22, 2015, *Michael Grieco et al. v. Amy Merrill et al.*, Case No. 502012CA021342 (Fla. 15th Cir. Ct.).

```
 8   Q.    Well, the cover page for the article is dated July
 9   31st, 2008; right?
10   A.    (Witness nods head.)
11   Q.    So Walmart was aware people were actually huffing in
12   their stores and passing out in 2008; right?
13   A.    Yes.  Again, those types of incidents are what led
14   us to request that there was a bittering agent in the
15   products.
```

97.     In 2011, Walmart required the Defendants to incorporate a bitterant in their product before they could be sold at Walmart stores. Yet, even with addition of a bitterant, huffing continued to be a problem. Indeed, Walmart was later notified that the bittering agent added to Ultra Duster was ineffective.[67]

---

[67] *Id*. at 53:6-55:1.

6    Q.    (Mr. Cornwell continued.)  Well, it wa        lear

7    and foreseeable to walmart that its customers, many of

8    them, buy this product to inhale it and get high in 2012.

9              MR. SANTIAGO:  Object to the form.

10             MR. WOOD:  Move      like.

11   A.    Again, walmart was awar       people bought this

12   type of product and were    ing it or misusing it.  And

13   because of that, that'       walmart moved to purchase only

14   those products with the bitterant.  There's also warning

15   labels and quite a few things on the product that state

16   that people should not do that.

17   Q.    (Mr  Cornwell continued.)  walmart, in fact, in 2012

18   was aware of an allegation by one of its former suppliers

19   that Ultra Duster and the bitterant in it were in --

20         that.

21         In 2012, when my clients were injured by a customer

22   of walmart who had been inhaling ultra Duster, walmart was

23   aware that one of its former suppliers contended the

24   bitterant in ultra Duster was ineffective: correct?

1    A.    Walmart had received a -- a notice from a competitor

2    of this particular product supplier stating that, yes.

3    Q.    (Mr. Cornwell continued.)  walmart was also aware of

4    hundreds of incidents involving individuals inhaling Ultra

5    Duster on store property, in the store parking lot,

6    driving vehicles, crashing cars, killing themselves, and

7    killing others, in 2012, wasn't it?

8              MR. WOOD:  Same objection.

9    A.    Again, I don't know the specific nature of the

10   complaints.  walmart was aware that there were incidents

11   involving people inhaling this product, and that's why

12   walmart engaged with the suppliers to determine what sort

13   of action could be taken to deter that type of activity.

14   Q.    (Mr. Cornwell continued.)  Do you know when walmart

15   required its canned air suppliers to incorporate a

16   bitterant in the product?

17   A.    I believe it was 2011.

37



98.    AW Distributing corporate representative Kennic Ho was deposed in the same case.

Mr. Ho is also the current registered agent of both the AW Distributing and AW Product Sales.

Mr. Ho was asked about the bitterant added to Ultra Duster and was unable to identify it by name.

He stated simply that the bitterant was "bitter and stinky."[68]

---

[68] Kennic Ho Dep. 47:1-17 (Feb. 15, 2016), *Michael Grieco et al. v. Amy Merrill et al.*, Case No. 502012CA021342 (Fla. 15th Cir. Ct.).

```
                                                                    47
11:41   1            Do you know what the bitterant is that's
11:41   2   contained within Ultra Duster?
11:41   3       A.    From what I know, bitterant is just -- tastes
11:41   4   bitter and stinky.
11:41   5       Q.    Have you ever heard of something called
11:41   6   "denatonium benzoate"?
11:42   7            THE INTERPRETER:  Counsel, can I research that
11:42   8   word in Chinese?
11:42   9            MR. KOLTON:  Yeah.
11:42  10            THE INTERPRETER:  Can you spell that for me.
11:42  11            MR. KOLTON:  Sure.
11:42  12            D-e-n-a-t-o-n-i-u-m b-e-n-z-o-a-t-e.
11:42  13            It's two --
11:42  14            And let me --
11:42  15            THE INTERPRETER:  Denatonium; right?
11:42  16            MR. WARING:  Object to form.
11:42  17            THE WITNESS:  No.
```

99.     Later in his deposition, Mr. Ho recalled that the bittering agent was DB.[69]

---

[69] *Id*. at 48:1-49:5.

48

| 11:43 | 1 | E-mail string, Mr. Ho, between you and somebody named |
| 11:43 | 2 | Hosoi-San that appears to be forwarding an E-mail |
| 11:43 | 3 | between you and a Mitch Moses. |
| 11:43 | 4 | Can you take a look at it, please. |
| 11:44 | 5 | Do you agree with me that this a conversation |
| 11:44 | 6 | you're having with Mitch Moses about denatonium |
| 11:44 | 7 | benzoate? |
| 11:44 | 8 | MR. WARING: Object to form. |
| 11:44 | 9 | THE WITNESS: Yes. |
| 11:44 | 10 | BY MR. KOLTON: |
| 11:44 | 11 | Q. So you do know what "denatonium benzoate" is? |
| 11:44 | 12 | MR. WARING: Object to form. |
| 11:44 | 13 | THE WITNESS: So, looking at this E-mail, what |
| 11:44 | 14 | I was doing is I was just helping two parties to |
| 11:45 | 15 | exchange information. |
| 11:45 | 16 | BY MR. KOLTON: |
| 11:45 | 17 | Q. Which two parties were you helping? |
| 11:45 | 18 | A. Looking at this document here, one party is |
| 11:45 | 19 | the Japanese side, I hope. |
| 11:45 | 20 | The other side will be the American supplier. |
| 11:45 | 21 | Q. Do you remember what American supplier it was |
| 11:45 | 22 | or can you tell from this E-mail? |
| 11:45 | 23 | A. I believe they were called Tulstar. |
| 11:45 | 24 | Q. What is Tulstar, if you know? |
| 11:45 | 25 | A. It's a company name. |



49

| 11:46 | 1 | Q. Do you know what Tulstar does? |
| 11:46 | 2 | A. Based on this document, they probably sell |
| 11:46 | 3 | this thing. |
| 11:46 | 4 | Q. What thing are you making reference to? |
| 11:46 | 5 | A. The bitterant. |

100.    According to a Safety Data Sheet, revision dated March 17, 2010, AW's Ultra Duster was then comprised 100% of 1,1-Difluoroethane.



101.    Several months later, a company named Bureau Veritas provided a Non-Corrosive Certificate for Ultra Duster. According to this certificate, dated November 12, 2010, Ultra Duster cans were comprised of 99.90% DFE and .10% 2,6-xylylcarbamoylmethyl (another name for denatonium benzoate or DB).[70] The certificate also refers to "intentional misuse (*i.e.*, deliberate inhalation of the product)" indicating that AW Defendants were aware Ultra Duster was used as an inhalant.

---

[70] http://www.awdus.com/Ultra%20Duster%20Web%20documents/Bureau%20Veritas%20Test%20on%20Ultra%20Duster.pdf

102.    Comparing the March 17, 2010 Safety Data Sheet to the November 12, 2010 Bureau Veritas Certificate, it appears that the formulation of Ultra Duster was changed to include DB. Based upon the testimony in the *Grieco* case, it appears AW added DB to its computer duster products to continue selling them at Walmart.

103.    Upon information and belief, Falcon Safety Products and Norazza followed suit in order to continue to sell their computer dusters at Walmart and at other retailers.

104.    Falcon Safety Products issued a press release in 2006 entitled "New Dust-Off (™) Formula Deters Inhalant Misuse."[71] This formula was based on the joint research and development between Falcon and DuPont, which was subsequently patented in 2010.[72]

105.    According to the original patent:

> [T]hese duster products provide a safe and valuable function to the consumer, but sometimes are involved in inhalation misuse incidents… One such approach [to deter intentional inhalation of dust removers] is to incorporate a denaturant in the aerosol duster than can be detected in an abuse scenario, but undetectable when duster products are used as recommended.[73]

106.    Greg Mas, one of the authors of the patent and the current Chief Financial Officer of Falcon Safety Products, gave testimony in another personal injury case involving huffing. Mas was asked about the quantity of DB added to each can of Dust-Off. Mas testified that the target range for the DB was "5 to 50 ppm [parts per million]."[74]

---

[71] https://www.prweb.com/releases/2006/10/prweb461265.htm.

[72] *See* J.A. Creazzo, G.W. Jepson, and G. Mas, Liquified-gas aerosol dusting composition containing denatonium benzoate, United States Patent, US 7,754,096 B2. https://patents.google.com/patent/US7754096B2/en.

[73] *Id.*

[74] Gregory Mas Dep. 10:2-25 (June 18, 2019), *Shannon Cheney v. Stephen Willson et al.*, Case No. 502013CA007140 (Fla. 15th Cir. Ct.).

```
2       Q    And do you recall what the target amount of
3    bittering agent was for cans of Falcon Safety Products
4    dusters that were being manufactured and sold by them?
5       A    We wanted -- I think we covered this in the
6    last deposition, but we wanted to be within the range,
7    the defined range of the IP which is 5 to 50 PPM and we
8    tried to get it close to 10 PPM initially, as we talked
9    about in the last deposition.
10      Q    And how did you go about, as you put it,
11   trying to get it close to 10 parts per million?
12      A    Based on our doser.  We're using an EFD doser
13   that's incredibly accurate using pharmacies -- not
14   pharmacies -- pharmaceuticals and medical labs.
15      Q    And so the goal was to inject in each can an
16   amount of bittering agent that when expressed as a
17   percentage of the contents of the entire can, the
18   bittering agent would constitute approximately 10 parts
19   per million; is that correct?
20      A    That was roughly what we wanted it to be.
21      Q    When you say roughly, was there a range that
22   you sought to achieve?
23      A    No, but it wasn't a perfect science, but we
24   were -- we were very close.  Anything inside the 5 to 50
25   PPM was what we were targeting.
```

107.    Yet, as the foregoing testimony illustrates, Defendants failed to conduct testing to confirm that the bitterant DB which they added to their dusters worked as warranted to deter huffing abuse. The increasing problem of huffing as shown by the various public databases and surveys – which notably continued to increase rapidly after addition of the bitterant – indicates that the bitterant was ineffective as a deterrent.

43

108.    Moreover, Defendants' sales figures appear to be inflated by the huffing. CFO of Falcon Safety Products, Greg Mas, testified that Falcon sells **34 million cans per year**.[75] This is a vast number which is inexplicable without considering the massive scope of the huffing epidemic.



```
                                                  Page 241
 1        Q.      What benefits do compressed gas dusters
 2   provide that justifies death and serious injury to
 3   incident bystanders who are injured by these people
 4   driving around huffing?
 5        A.      A duster when --
 6              MR. BEDARD:  Objection to the form of
 7   the question.
 8        A.      A duster when used correctly is
 9   perfectly safe and it can be used in many, many
10   different situations.  It's very effective, it's
11   efficient, it's very economical.  We sell
12   about 34 million of them a year in the industry as a
13   subset of the 35 billion aerosols in the industry.
```

109.    Upon information and belief, AW has similar sales.

110.    Upon information and belief, Norazza has similar sales.

**F.    DB is ineffective at deterring huffing and may increase the risks of huffing**

   **1.    <u>DB — A bitter denaturant used to prevent accidental poisoning</u>**

111.    Denatonium benzoate, known as DB, is an alcohol denaturant which has been heavily promoted for inclusion in household products, gardening products, and cosmetics to purportedly prevent accidental ingestion by children.[76]

---

[75] Gregory Mas Dep. 241:1-13 (July 14, 2016), *Shannon Cheney v. Stephen Willson et al*, Case No. 502013CA007140 (Fla. 15th Cir. Ct.) (excerpted from Exhibit C to Plaintiff's Response in Opposition to Defendants Renewed Motion for Summary Judgment).

[76] https://www.sciencedirect.com/topics/medicine-and-dentistry/denatonium-benzoate

112.    According to the Guinness Book of World Records, DB (also known by its tradename "Bitrex") is "the most bitter substance in the world." It is so bitter that it can be detected by dropping a mere thimble-full into an Olympic size swimming pool.[77]  Despite being the most bitter substance, the manufacturer of Bitrex openly advertises that the bitter taste can be easily averted with a sugary substance, like chocolate.



113.    DB has a modest effect on deterring accidental ingestions. For example, in a 1991 study, authors Sibert and Frude examined DB as a deterrent among 33 children aged 17-36 months.

---

[77] https://www.bitrex.com/en-us/about-bitrex/what-is-bitrex

The children were provided orange juice containing 10 ppm of DB. 30 children took a drink of orange juice with DB. Among those 30 children, nearly one-fourth of the children proceeded to drink after the initial exposure.[78] Notably, the concentration of DB in this study was more than 25 times the concentration expected in the vapor phase of computer dusters.

114.    Per the 2008 Cosmetic Ingredient Review Expert Panel, DB has the following perceptual characteristics:

| Perceptual characteristics in measurement terms parts per million or parts per billion |
| --- |
| DB is *detectable* at .01 ppm (10 ppb) |
| DB is *recognizably* bitter at .05 ppm (50 ppb) |
| DB is *unpleasantly* bitter at 10 ppm (10,000 ppb) |
| DB is *aversively* bitter at 20-50 ppm (20,000-50,000 ppb)[79] |

### a.    DB has not been added at the necessary concentration to deter abuse

115.    Detection and recognition are critical concepts related to the theory of bitterants as deterrents to inhalant misuse. Keast and Roper, in a 2007 article, defined these concepts as follows:

> [A] chemical may be in a solution at a concentration that the sample population could not detect. As a concentration of the chemical increases, a detection threshold will be reached, the level at which the chemical in solution may be discriminated from water. As the concentration of the chemical increases further, the recognition threshold is reached, the point at which the quality (e.g. bitter) can be identified. As concentration of the chemical increases still further, the intensity of the bitterness mutually

---

[78] J. R. Sibert & N. Frude, *Bittering agents in the prevention of accidental poisoning: children's reactions to denatonium benzoate (Bitrex)*, 8 ARCHIVES OF EMERGENCY MEDICINE 1, 1 (1991).

[79] Cosmetic Ingredient Review Expert Panel. (2008). Final report of the safety assessment of Alcohol Denat., including SD Alcohol 3-A, SD Alcohol 30, SD Alcohol 39, SD Alcohol 39-B, SD Alcohol 39-C, SD Alcohol 40, SD Alcohol 40-B, and SD Alcohol 40-C, and the denaturants, Quassin, Brucine Sulfate/Brucine, and Denatonium Benzoate. INTERNATIONAL JOURNAL OF TOXICOLOGY, 27 Suppl 1, at 4. https://doi.org/10.1080/10915810802032388

increases to a theoretical asymptote were concentrate increases no longer cause subsequent increases in intensity.[80]

116.    The following graphic illustrates these concepts:



117.    As this graphic shows, aversely bitter is the threshold level of a true deterrent. The level of DB which is added to dusters per the DuPont patent is 5-50 ppm, which should fall within the range of being unpleasantly bitter to adversely bitter.[81] Yet, pursuant to the data, huffing continues to increase. So, where is the disconnect?

### b.    <u>Differences between accidental ingestion and intentional ingestion</u>

118.    While accidental ingestion by children is often the result of normal exploratory behavior, huffing DFE is a fundamentally different proposition. Specifically, the underlying motivation is completely different.

119.    A 2010 study authored by Bromberg-Martin et al. observed:

> We seek rewards and assign them a positive value, while we avoid aversive events and assign them a negative value. In other respects we treat rewarding and aversive events in similar manners, reflecting their similar motivational

---

[80] Russell S. J. Keast & Jessica Roper, *A Complex Relationship Among Chemical Concentration, Detection Threshold, and Suprathreshold Intensity of Bitter Compounds,* 32 CHEMICAL SENSES 245, 245 (2007).

[81] *See* J.A. Creazzo, G.W. Jepson, and G. Mas, Liquified-gas aerosol dusting composition containing denatonium benzoate, United States Patent, US 7,754,096 B2. https://patents.google.com/patent/US7754096B2/en

salience. Both rewarding and aversive events trigger orienting of attention, cognitive processing, and increases in general motivation.[82]

120.    While an unpleasant taste can plausibly disrupt accidental ingestion, whether DB produces a taste so disgusting that avoiding the aversive state (*i.e.*, unpleasant bitter taste) is more desirable than achieving the rewarding state (*i.e.*, euphoria or intoxication) must be considered. The patent Defendants follow fails to mention this consideration.[83]

121.    According to the original patent, people would be deterred from inhalant use if they simply "detected" DB in a misuse scenario.[84] However, to achieve a true deterrent effect, the concentration of DB must be at a level to make the experience sufficiently noxious or disgusting. While this may be true related to accidental ingestion, research suggests that inhalant misuse is entirely different. For example, if a person is motivated to get drunk, an unpleasant taste may not deter them from drinking alcohol. Similarly, exposing someone to the lowest possible concentration of DB that can be detected or recognized will likely not affect a goal-seeking behavior (*i.e.*, the intent to get high).

122.    Per the DuPont patent, DB is added in solid form to the can of liquid DFE aerosol. DB dissolves within the can by addition of a solvent. The can is pressurized and the liquids are expressed in a gas vapor.[85] There is no evidence to suggest that DB's detection levels, recognition, and aversiveness in a concentrated vapor spray are equivalent to a liquid.

---

[82] E.S. Bromberg-Martin, M. Matsumoto, and O. Hikosaka, *Dopamine in motivational control: Rewarding, aversive, and altering*, 68 NEURON 815, 815-834 (2010).

[83] *See* J.A. Creazzo, G.W. Jepson, and G. Mas, Liquified-gas aerosol dusting composition containing denatonium benzoate, United States Patent, US 7,754,096 B2. https://patents.google.com/patent/US7754096B2/en.

[84] *Id*.

[85] *Id*.

123. Indeed, Stephen Willson, an individual who huffed DFE and subsequently hit the plaintiff in the *Cheney v. Willson* case while driving under the influence, testified regarding the taste of bitterant in Dust-Off. Willson could identify the bitterant taste, but described it as not "overwhelming" and compared it to the taste of vodka.[86]

```
 2    A.)  It had a taste, but it wasn't an overwhelming --
 3   it wasn't pleasant, but it wasn't overwhelming.
 4        Q.)  So if I understand -- I want to make sure I heard
 5   correctly.)  You said it was not a pleasant taste?)
 6        A.)  Uh-huh.)
 7        Q.)  Is that correct?)
 8        A.)  Yes.)
 9        Q.)  Okay.)  I'm just trying to make sure the record is
10   clear.)  That's why I was asking --
11        A.)  Okay.)  Yeah.)
12        Q.)  And despite this unpleasant taste, was it your)
13   desire to -- to get high that made you overcome this --
14   this unpleasant taste or --)
15        A.)  Not un --)
16        Q.)  -- suffer through it?)
17        A.)  Not unlike vodka, which isn't particularly
18   pleasant, either.)  Yes.)
```

---

[86] Stephen Willson Dep., 58:1-18 (June 10, 2014), *Shannon Cheney v. Stephen Willson et al*, Case No. 502013CA007140 (Fla. 15th Cir. Ct.).

124.    Willson's testimony indicates that the concentration of DB in the gas vapor phase is significantly less than the 5-50 ppm range which is contemplated by the DuPont patent. Willson describes his detection level as being in the .01-.05 ppm range and certainly below the level of being aversely bitter.

125.    Researchers have noted that addition of the bitterant to computer dusters does not appear to deter huffing. Specifically, a study published in the Journal of American Toxicology notes: "Companies that manufacture [dusters] are aware of [inhalant abuse] and add a bittering agent to deter abuse, but it is unknown whether this reduces the prevalence or not."[87]

### c.  Other considerations make DB an improper bitterant in this application

126.    Even if DB has a deterrent effect – which the evidence indicates it does not – its impact has limited effect among the broader population of inhalant users. A CPSC report on aversive agents states:

> The ability to detect the bitter taste of certain propylthiourea derivatives is a genetic trait. Between ***15-30%*** of ***the adult population are unable to detect the bitter taste of this class of compounds***. Psychological studies have shown that non tasters may also be unable to detect other bitter molecules, ***including saccharin and denatonium benzoate***.[88]

127.    In addition, there are serious potential harmful effects of DB as a bitterant. In a letter to the journal Forensic Toxicology authored by Perron, et al. (2010), certain individuals are at increased risk when inhaling DB-containing DFE due to DB being a bronchodilator. Specifically, they state:

---

[87] Chris Vance, et al, *Deaths Involving 1,1-Difluoroethane at the San Diego County Medical Examiner's Office*, 39 J. ANAL. TOXICOL. 626, 626-633 (Nov./Dec. 2012), https://academic.oup.com/jat/article/36/9/626/784617

[88] *See* U.S. CONSUMER PRODUCT SAFETY COMMISSION, FINAL REPORT: STUDY OF AVERSIVE AGENTS 18 (1992) (emphasis added). *See also* Cosmetic Ingredient Review Expert Panel. (2008). Final report of the safety assessment of Alcohol Denat., including SD Alcohol 3-A, SD Alcohol 30, SD Alcohol 39, SD Alcohol 39-B, SD Alcohol 39-C, SD Alcohol 40, SD Alcohol 40-B, and SD Alcohol 40-C, and the denaturants, Quassin, Brucine Sulfate/Brucine, and Denatonium Benzoate, *supra*.

The absorption of DFE and similar volatile anesthetics is rapid and minimally influenced by bronchial airway tone, but the potent relaxation induced by DB may impact the way DFE behaves in the body. While DB-induced bronchial relaxation may not overly impact most individuals who inhale DB-containing DFE products, there is a potential risk that those with symptomatic asthma or other bronchoconstrictive disease may experience increased effects from DFE when inhaled with DB.

128.    Moreover, the rapid effects of DFE simply make it unlikely that a person under the influence will be thinking about an unpleasant bitter taste in the same way that a sober individual would.

129.    If properly added to Defendants' computer dusters, DB should operate to prevent huffing. Abusers should immediately gag and would certainly avoid continued huffing. Yet, huffing abuse continues to occur and Nick Leet is one of thousands of victims.

### G. Independent tests show that DB is not present in the quantity Defendants represent or at the threshold level of detectability to most human subjects

130.    An independent test of three 12 oz. cans of Ultra Duster, Dust Off, Endust, and Surf onn. was recently conducted by Research Triangle Park Laboratories, Inc. Specifically, the lab used a validated testing method to expel and measure the contents of each can. Cans were weighed before and after each phase of testing. The testing method mimicked an individual putting the can straw into their mouth and inhaling the product.

131.    The lab utilized a capture apparatus that collected gas in a Tedlar sampling bag – a bag designed by DuPont and validated by the Environmental Protection Agency as appropriate for testing products in the gas phase.

132.    The results were shocking: Only trace amounts of DB were present in the gas phase of the Ultra Duster cans, and zero DB was present in the gas phase of the Dust Off, Endust, and Surf onn. cans. The test also showed wild fluctuations in the amount of DB inside the cans.

| | Ultra Duster | Dust Off | Endust | surf onn |
|---|---|---|---|---|
| DB in Gas Phase (ppbv) | 3.38 | 0.00 | 0.00 | 0.00 |
| Total DB in Can (ppm) | 0.019 | 0.001 | 62.869 | 10.432 |





133.    This amount of DB is less than the recognized level at which a bitterant would be detectable to humans according to testing sponsored by the Consumer Product Safety Commission and presented by the Cosmetic Ingredient Review Expert Panel.[89]

---

[89] *Id.*

| Perceptual characteristics in measurement terms parts per million or parts per billion |
|---|
| DB is *detectable* at .01 ppm (10 ppb) |
| DB is *recognizably* bitter at .05 ppm (50 ppb) |
| DB is *unpleasantly* bitter at 10 ppm (10,000 ppb) |
| DB is *aversively* bitter at 20-50 ppm (20,000-50,000 ppb)[90] |

134.    This testing coupled with the foregoing test data shows that Defendants knew or should have known that the bitterant they represented would help deter inhalant abuse neither discourages nor deters the foreseeable use of huffing because DB is not present in a sufficient quantity.

135.    Defendants failed to adequately test to determine if the bitterant they advertise as a deterrent was added in a proper manner to perform as warranted, specifically to "discourage inhalant abuse." Or worse, Defendants intentionally failed to add the proper amount of bitterant to cut costs and increase their own profits.

136.    Upon their own admission, Defendants undertook a duty to improve the safety of their computer dusters by adding bitterant to deter inhalant abuse. Defendants were also aware that, absent a bitterant, their computer dusters presented an unreasonable risk of harm to consumers.

137.    Defendants knew or should have known that the formulation in which the bitterant is added does not deter abuse and, thus, rendered their computer dusters defective. Yet, Defendants continued to design, manufacture, label, market and distribute the products in a defective manner.

138.    Defendants knew or should have known that huffing DFE is addictive and intentionally failed to warn consumers that foreseeable misuse of the product could lead to inhalant addiction, inhalant abuse disorder and, ultimately, death.

---

[90] *Id.*

139.    Defendants labeled their computer dusters in a manner which contain false claims, specifically that each can "contains a bitterant to help discourage inhalant abuse" or similar language, when Defendants are aware that the bitterant is ineffective and fails to discourage inhalant abuse.

140.    Defendants placed their dusters into the stream of commerce in a defective and unreasonably dangerous manner.

141.    Upon information and belief, the bitterant put into the can does not come out of the can in sufficient quantity to deter inhalation and huffing.

## V.  CLAIMS FOR RELIEF

## COUNT I: STRICT PRODUCTS LIABILITY – DESIGN DEFECT

142.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

143.    Plaintiffs bring this claim for strict liability pursuant to K.S.A. § 60-1801 and § 60-1901 *et seq*.

144.    Defendants are all manufacturers who designed, produced, made, fabricated, or constructed the products at issue in this case, which include Ultra Duster, Dust-Off, Endust, and the private label versions of each of these respective products (collectively "computer dusters"), prior to these products being sold or used. Defendants fall within the definition of "manufacturers" under the Kansas Products Liability Act, K.S.A. § 60-3302.

145.    At all times relevant herein, Defendants' computer dusters were in substantially the same condition as when they left Defendants' control.

146.    At all times relevant herein, Ultra Duster, Dust-Off, Endust, and the private label versions of each of these respective products, were not altered in any way since the time they left Defendants' control.

147.    At the time of their sale and/or use, Defendants' computer dusters possessed numerous design defects that rendered them unreasonably dangerous to an extent beyond which would be contemplated by a consumer with ordinary knowledge common to the community as to its characteristics.

148.    Defendant knew or should have known by reasonable care of the following defects described herein.

149.    <u>Design Defect #1</u>: DFE is a highly addictive chemical. Each can of computer duster was comprised of 99.9% DFE, a dangerous refrigerant which is highly addictive and creates intense euphoria when inhaled or "huffed."

150.    The inclusion of DFE, a highly addictive substance, within computer dusters which are generally sold over-the-counter and can be obtained in bulk at big-box and small retailers including local hardware, office supply, and grocery stores constitutes a design defect that renders the products unreasonably dangerous to individuals.

151.    DFE effects the brain after an individual begins to engage in huffing because it is lipophilic (meaning it dissolves in liquids or fats), crosses the blood-brain barrier, affects the central nervous system, stimulates neurotransmitter GABA receptors, and inhibits NMDA receptors all of which combine to create an intense high with a depressant effect, euphoria, loss of coordination, motor control, and consciousness.[91]

152.    Based on publicly available data from verifiable sources such as the National Poison Data System (a data warehouse for the 55 poison control centers across the U.S.), the National Electronic Injury Surveillance System ("NEISS") (a database managed by the U.S.

---

[91] *See* Chart: Causal Explanation from Case Reports of Intoxication from DFE and citations thereto, p. 26, supra.

Consumer Product Safety Commission which catalogs injuries treated at a broad sampling of hospital emergency departments), and the National Survey of Drug Use and Health (an annual survey conducted in all 50 states which is an authoritative source for epidemiological data on tobacco, alcohol and drug use, mental health, and other health-related issues in the U.S.), inhaling or huffing computer duster is increasing *exponentially* in terms of frequency, and results in significant numbers of injuries and fatalities on an annual basis. According to the NEISS hospital record database, computer dusters accounted for more emergency room visits than any other category of inhalant with 16,927 such visits during the period 2011-2018.[92] Moreover, since 2015, 2.5 million people have reported misusing computer dusters[93] and, since 2010, at least 2,018 people have died from DFE inhalation.[94]

153.    Defendants were aware that huffing is a common and foreseeable use of their computer dusters and of the risks posed by this foreseeable use.

154.    Defendants are also aware that DFE has addictive properties and increases the risk of inhalant abuse.

155.    Design Defect #2: DB is not added in a proper quantity or manner to deter huffing. Ostensibly to deter the foreseeable use of huffing, Defendants re-designed the computer dusters at issue to add the bitterant DB. Defendants included the bitterant under pressure from their retail partners who began refusing to sell dusters without bitterant in their stores.[95]

156.    Each computer duster can consists of approximately .01% of the bitterant DB.

---

[92] Forrester, *supra*, at 180-183.

[93] *See* https://nsduhweb.rti.org/respweb/homepage.cfm. *See also* IV Facts, section B(b), *supra*.

[94] https://www.cpsc.gov/Data

[95] *See* IV Facts, Section E, *supra*.

157.    Defendants all followed the same patented procedure to add DB to their computer dusters. Specifically, DB is added in a solid form to the liquified DFE gas aerosol at a target quantity of 5 to 50 parts per million (ppm). DB is dissolved in the liquified DFE gas aerosol and theoretically is intended to mix evenly throughout the can so it may be expressed from the can in the same concentration.[96] However, when pressurized and expressed from the can, DB is not present in a sufficient quantity to be detectable, much less aversively bitter.

158.    Defendants affixed labeling to the computer dusters cans at issue which warranted that a bitterant was added to "help discourage inhalant abuse," or similar language warranting that the bitterant had a deterrent effect to prevent huffing.

159.    The DB formulation used by Defendants in the design of their computer dusters does not have the intended and warranted deterrent effects to prevent misuse as evidenced by the fact that the incidence of huffing has increased exponentially since bitterant was added to the dusters.

160.    <u>Design Defect #3</u>:  The selection of DB as a bitterant is problematic because a significant percentage of people cannot taste it in any quantity. Namely, DB is among the class of bitter compounds which cannot be detected by approximately 15-30% of the adult population. These individuals lack a genetic trait which allows them to taste the bitter properties of certain "propylthiourea derivatives."[97]

---

[96] *See* J.A. Creazzo, G.W. Jepson, and G. Mas, Liquified-gas aerosol dusting composition containing denatonium benzoate, United States Patent, US 7,754,096 B2. https://patents.google.com/patent/US7754096B2/en.

[97] *See* U.S. CONSUMER PRODUCT SAFETY COMMISSION, FINAL REPORT: STUDY OF AVERSIVE AGENTS (1992). *See also*, Cosmetic Ingredient Review Expert Panel. (2008). Final report of the safety assessment of Alcohol Denat., including SD Alcohol 3-A, SD Alcohol 30, SD Alcohol 39, SD Alcohol 39-B, SD Alcohol 39-C, SD Alcohol 40, SD Alcohol 40-B, and SD Alcohol 40-C, and the denaturants, Quassin, Brucine Sulfate/Brucine, and Denatonium Benzoate, *supra*.

161.     Due to DB's reduced effectiveness as a deterrent in all cases and its complete ineffectiveness in a large subsection of the population, its inclusion as a safety feature is a design defect.

162.     Design Defect #4: DB increases the risk of inhalation of DFE. Finally, and in addition to the other design flaws described above, DB is "bronchodilator" that operates to relax the muscles in the lungs. Similar to the effect of an asthma inhaler, DB operates to widen a person's airway upon being inhaled. This is the opposite of the desired effect.

163.     As a result, users who inhale the contents emitted from the computer dusters may breathe in a greater quantity of DFE than if the bitterant were not included at all.

164.     As a direct, substantial, and proximate result of these design defects, (1) the addictive nature of DFE, (2) use of an ineffective bitterant composition, (3) the use of an ineffective bitterant, and (4) the dilating effect of the bitterant on a person's respiratory system, users like Nick Leet, were at an increased risk of becoming addicted to DFE (than if another less or non-addictive substance was used), at an increased risk of inhaling more DFE (than if the bitterant was effective or not included at all), and ultimately at an increased risk of suffering injury, including death by using Defendants' products.

165.     Plaintiffs seek the full measure of relief as provided under the law, including damages for pecuniary and non-pecuniary losses, attorneys' fees and costs, and any other relief this Court deems just and proper.

## COUNT II:  STRICT PRODUCTS LIABILITY – FAILURE TO WARN

166.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

167.    Plaintiffs bring this claim for strict liability pursuant to K.S.A. § 60-1801 and § 60-1901 *et seq*. Defendants are all manufacturers who designed, produced, made, fabricated, or constructed the products at issue in this case, which include Ultra Duster, Dust-Off, Endust, and the private label versions of each of these respective products, prior to these products being sold or used. Defendants fall within the definition of "manufacturers" under the Kansas Products Liability Act, K.S.A. § 60-3302.

168.    At all relevant times herein, Defendants' computer dusters were in substantially the same condition as when they left Defendants' control.

169.    At all times relevant herein, Ultra Duster, Dust-Off, Endust, and the private label versions of each of these respective products, were not altered in any way since the time they left Defendants' control.

170.    At the time of sale, Defendants' computer dusters were defective and unreasonably dangerous because the products (1) failed to warn of the addictive nature of the primary ingredient, DFE, (2) failed to warn that DB was not added in a quantity or manner that would have a deterrent effect, (3) failed to warn that DB is undetectable to a broad swath of the population in any quantity, and (4) failed to warn that the bitterant DB has a dilating effect on the respiratory system, which can lead to increased inhalation of DFE, a highly volatile and addictive substance.

171.    Defendants knew or should have known by exercising reasonable care of the defects described herein and the attendant risks they posed to consumers and users.

172.    Defendants had a duty to warn consumers and users about the risks associated with DFE, specifically of its addictive properties, a duty to warn that DB was not present in the necessary quantity to achieve a deterrent effect, a duty to warn that DB might be undetectable at any quantity, and a duty to warn that its bitterant DB can increase the amount of DFE inhaled.

173.    <u>Risk #1: Failure to Warn</u>. Each can of computer duster at issue in this case was comprised of 99.9% DFE, a dangerous refrigerant which is highly addictive and can creates a euphoric sensation when huffed.

174.    DFE is a volatile substance that stimulates a neuro-chemical reaction that produces euphoria and, with repeated or prolonged use, can cause injury or death and abrupt cessation can induce withdrawal. DFE effects the brain after an individual begins to engage in huffing because it is lipophilic (meaning it dissolves in liquids or fats), crosses the blood-brain barrier, affects the central nervous system, stimulates GABA receptors, and inhibits NMDA receptors all of which combine to create an intense high with a depressant effect, euphoria, loss of coordination, motor control and consciousness.[98]

175.    Defendants knew or should have known of the risks associated with exposure to DFE, including the risk of death and the risk that users could become addicted to inhaling DFE. [99]

176.    Despite ample publicly available scientific data on the addictive nature of DFE, Defendants failed to warn of this inherent risk, danger, or hazard in Ultra Duster, Dust Off, Endust, and the private label versions of these products. This failure to warn renders these computer dusters unreasonably dangerous.

177.    <u>Risk #2: Failure to Warn</u>. Defendants also failed to warn that the bitterant DB was not added in a quantity or in a manner that could ever have a deterrent effect on individuals engaged in the foreseeable use of huffing.

---

[98]  *See* Chart: Causal Explanation from Case Reports of Intoxication from DFE and citations thereto, at ¶ 72, *supra*.

[99] Under the "state of the art" approach to strict liability failure to warn claims followed in Kansas, the manufacturers had at least constructive knowledge of the associated risks posed by the product that weren't warned about. *See* Custer, *supra*.

178.    Defendants are aware or should have been aware that, in order to be minimally effective as a deterrent, DB must be added to computer duster cans in a quantity sufficient to be aversively bitter to human taste. Also, even if added to the cans at the minimum threshold level, DB must convert to the gas phase and be expressed from the cans at the same minimum threshold level to achieve a deterrent effect. Yet, the bitterant DB was neither added to the can nor capable of being expressed from the can in sufficient quantities to be detectable much less aversively bitter.

179.    <u>Risk #3: Failure to Warn</u>. Defendants failed to warn that the bitterant DB is among a class of compounds which a broad swath of the population cannot taste in any quantity. The ability to detect the bitter taste of DB is a genetic trait which many individuals lack. Defendants knew or should have known that this renders DB an ineffective choice of bitterant.

180.    <u>Risk #4: Failure to Warn</u>. Defendants also failed to warn that the bitterant DB is a bronchodilator that operates to relax the muscles in the lungs and to widen a person's airway when inhaled, similar to the effect of an asthma inhaler, thereby increasing the risk of harmful levels of DFE and increasing the risk a user will become addicted to the substance – the opposite of the purported deterrent effect!

181.    These failures to warn rendered Defendants' computer dusters defective and unreasonably dangerous under K.S.A. § 60-3301.

182.    Nick Leet was not adequately warned by the Defendants of the inherent risks, dangers, or hazards of becoming addicted to DFE, was not adequately warned that DB could not deter him from huffing, was not adequately warned that he may have been among the group of individuals unable to taste DB, and was not adequately warned that he could inhale a deadly quantity of DFE from the computer dusters at issue due to the presence of DB. As a direct, substantial, and proximate result, Nick Leet suffered physical injuries and died.

183.    Plaintiffs seek the full measure of relief as provided under the law, including damages for pecuniary and non-pecuniary losses, attorneys' fees and costs, and any other relief this Court deems just and proper.

## COUNT III:  NEGLIGENT DESIGN DEFECT

184.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

185.    Plaintiffs brings this claim for negligence pursuant to K.S.A. § 60-1801 & § 60-1901 *et seq*.

186.    Defendants are all manufacturers who designed, produced, made, fabricated, or constructed the products at issue in this case, which include Ultra Duster, Dust-Off, Endust, and the private label versions of each of these respective products, prior to these products being sold or used. Defendants fall within the definition of "manufacturers" under the Kansas Products Liability Act, K.S.A. § 60-3302.

187.    As manufacturers, Defendants had a duty to exercise reasonable care in the design of the computer dusters at issue in this case.

188.    Negligent Design, Reason #1. Defendant utilized the volatile chemical compound DFE as the primary substance in its computer dusters, despite its known addictive properties.

189.    DFE is a highly addictive, volatile substance that stimulates a neuro-chemical reaction that produces euphoria and with repeated or prolonged use can cause injury or death and abrupt cessation can induce withdrawal. DFE effects the brain after an individual begins to engage in huffing because it is lipophilic (meaning it dissolves in liquids or fats), crosses the blood-brain barrier, affects the central nervous system, stimulates GABA receptors, and inhibits NMDA

receptors all of which combine to create an intense high with a depressant effect, euphoria, loss of coordination, motor control and consciousness.

190.    By defectively designing a product that utilizes a highly addictive chemical compound known to encourage misuse and cause injury, including death, Defendants breached the standard of care required of a reasonable manufacturer and owed to consumers and users of its products.

191.    Negligent Design, Reason #2. Further, Defendants assumed a voluntary and additional duty to make their computer dusters "safe" by adding a substance, DB, to the duster cans as a bitterant, purportedly to deter inhaling abuse. Yet, Defendants failed to add DB in the proper quantity and manner to render DFE aversively bitter.

192.    Each computer duster can consists of approximately .01% of the bitterant DB.

193.    Defendants all followed the same patented procedure to add DB to each of the brands of computer duster at issue in this case. In the gas phase, the concentration of DB is far below a level which would be detectable and nowhere near the level that could prevent huffing.

194.    Specifically, according to the patent that the Defendants allegedly followed, DB is added in a solid form to the liquified DFE gas aerosol at a target quantity of 5 to 50 parts per million (ppm). DB is dissolved in the liquified DFE gas aerosol and theoretically is intended to mix evenly throughout the can.

195.    However, when placed under pressure and expressed from the can, DFE and the small quantity of the bitterant DB are converted to a gas vapor. Pursuant to the patented design for addition of the bitterant, in the gas phase the concentration of DB is only 50 to 500 ppb.

196.    At 50 to 500 ppb, the concentration of DB is at best *recognizably* bitter but does not rise to the level of being *aversively* bitter, which is the scientifically-validated threshold at which DB would deter inhalant abuse.

197.    Defendants do not even add the amount of bitterant called for in the patented design. Thus, in the gas phase, the concentration of DB is far below a level which would be detectable and nowhere near the level that could deter huffing.

198.    The DB formula concentration used by Defendants in the design of their computer dusters does not have the intended and warranted deterrent effects to prevent misuse as evidenced by the fact that the incidence of huffing has increased exponentially since bitterant was added to the dusters.

199.    <u>Negligent Design, Reason #3.</u> DB is an ineffective choice of bitterant. Namely, DB is among the class of bitter compounds which cannot be detected by approximately 15-30% of the adult population. These individuals lack a genetic trait which allows them to taste the bitter properties of certain "propylthiourea derivatives."[100]

200.    <u>Negligent Design, Reason #4.</u> DB is not only ineffective as a deterrent to huffing, but actually increases the risk and amount of DFE inhalation!

201.    DB is a "bronchodilator" that operates to relax the muscles in the lungs and to widen a person's airway upon being inhaled, similar to the effect of an asthma inhaler, thereby increasing the risk a user will become addicted to DFE and increasing the risk of inhaling a deadly quantity

---

[100] *See* U.S. CONSUMER PRODUCT SAFETY COMMISSION, FINAL REPORT: STUDY OF AVERSIVE AGENTS, (1992). *See also*, Cosmetic Ingredient Review Expert Panel. (2008). Final report of the safety assessment of Alcohol Denat., including SD Alcohol 3-A, SD Alcohol 30, SD Alcohol 39, SD Alcohol 39-B, SD Alcohol 39-C, SD Alcohol 40, SD Alcohol 40-B, and SD Alcohol 40-C, and the denaturants, Quassin, Brucine Sulfate/Brucine, and Denatonium Benzoate, supra.

of the substance. Defendants therefore failed to exercise reasonable care in making the warranted safety modifications; instead, it made the computer dusters less safe and therefore breached their voluntarily assumed duty.

202.    As a direct, substantial, and proximate result of Defendants' breach of its duties by four negligent designs, (1) use of the highly addictive DFE as the prime ingredient in the dusters, (2) use of an ineffective bitterant composition, (3) use of a bitterant which is undetectable to a broad section of the population, and (4) the dilating effect of the bitterant on a person's respiratory system, users like Nick Leet, were at an increased risk of becoming addicted to DFE (than if another less or non-addictive substance was used), unable to taste the bitterant (either due to its ineffective composition or because they lacked the ability), at an increased risk of inhaling more DFE (than if the bitterant were not included at all), and ultimately at an increased risk of suffering injury, including death by using Defendants' products.

203.    Plaintiffs seek the full measure of relief as provided under the law, including damages for pecuniary and non-pecuniary losses, attorneys' fees and costs, and any other relief this Court deems just and proper.

## COUNT IV:  NEGLIGENT FAILURE TO WARN

204.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

205.    Plaintiffs bring this claim for negligence pursuant to K.S.A. § 60-1801 & § 60-1901 *et seq*.

206.    Defendants are all manufacturers who designed, produced, made, fabricated, or constructed the products at issue in this case, which include Ultra Duster, Dust-Off, Endust, and the private label versions of each of these respective products, prior to these products being sold

or used. Defendants fall within the definition of "manufacturers" under the Kansas Products Liability Act, K.S.A. § 60-3302.

207.   At all relevant times herein, Defendants' computer dusters were in substantially the same condition as when they left Defendants' control.

208.   At all times relevant herein, Ultra Duster, Dust Off, Endust, and the private label versions of each of these respective products, were not altered in any way since the time they left Defendants' control.

209.   As manufacturers, Defendants had a duty to exercise reasonable care to prevent their products from being unreasonably dangerous by providing adequate warnings on their products that are clear, correct, and conspicuous to consumers and users.

210.   At the time of sale, Defendants' computer dusters were defective and unreasonably dangerous because the products (1) failed to warn of the addictive nature of the primary ingredient, DFE, (2) failed to warn that DB was not added in the proper quantity and manner to be a deterrent, (3) failed to warn that DB is undetectable in any quantity to a broad section of the population, and (4) failed to warn that the bitterant DB has a dilating effect on the respiratory system, which can lead to increased inhalation of DFE, a highly volatile and addictive substance.

211.   Defendants knew or should have known by reasonable care of the foregoing defects described herein and the attendant risks they posed to consumers and users.

212.   Defendants had a duty to warn consumers and users about the risks associated with DFE, specifically of its addictive properties, and a duty to warn that the use of its bitterant DB can increase the amount of DFE inhaled.

213.    <u>Risk #1: Negligent Failure to Warn</u>. Each can of computer duster at issue in this case was comprised of 99.9% DFE, a dangerous refrigerant which is highly addictive and can creates a euphoric sensation when huffed.

214.    DFE is a volatile substance that stimulates a neuro-chemical reaction that produces euphoria and with repeated or prolonged use can cause injury or death and abrupt cessation can induce withdrawal. DFE effects the brain after an individual begins to engage in huffing because it is lipophilic (meaning it dissolves in liquids or fats), crosses the blood-brain barrier, affects the central nervous system, stimulates GABA receptors, and inhibits NMDA receptors all of which combine to create an intense high with a depressant effect, euphoria, loss of coordination, motor control and consciousness.

215.    Defendants knew or should have known of the risks associated with exposure to DFE.

216.    Despite ample publicly available scientific data on the addictive nature of DFE and the foreseeable use of huffing DFE, Defendants failed to warn of the addictive properties of DFE, an inherent risk, danger, or hazard in their computer dusters, in Ultra Duster, Dust Off, Endust, and the private label versions of these products, rendering the products unreasonably dangerous by this failure to warn.

217.    <u>Risk #2: Negligent Failure to Warn</u>. DB is ineffective as a bitterant. Defendants all followed the same patented procedure to add DB to each of the aforementioned brands of computer duster at issue in this case. Specifically, DB is added in a solid form at a target quantity of 5 to 50 ppm. DB is dissolved in the liquified gas aerosol and theoretically is intended to mix evenly throughout the can and be expressed from the can in an amount which makes DFE aversively

bitter. However, in the gas phase, the concentration of DB is far below this level and nowhere near the level that could potentially deter huffing.

218.    <u>Risk #3; Negligent failure to warn</u>. Defendants failed to warn that the bitterant DB is among a class of bitter compounds which cannot be detected by approximately 15-30% of the population. Selection of DB as a bitterant despite its ineffectiveness in a large subsection of the population constitutes negligence.

219.    <u>Risk #4; Negligent failure to warn</u>. Defendants also failed to warn that the bitterant DB is a "bronchodilator" that operates to relax the muscles in the lungs and to widen a person's airway upon being inhaled, similar to the effect of an asthma inhaler, thereby increasing the risk a user will become addicted to DFE and increasing the risk of inhaling a deadly quantity of the substance – the opposite of the purported deterrent effect!

220.    Defendants failed to warn ordinary consumers, including Nick Leet, about the addictive properties of DFE,  failed to warn that DB was ineffective as a bitterant in the quantity and manner it was added to the computer dusters, failed to warn that he could be unable to taste DB, and failed to warn of the increased risk of DFE inhalation due to the dilating effects that DB has on the respiratory system.

221.    These failures to warn rendered Defendants' computer dusters defective and unreasonably dangerous including under K.S.A. § 60-3301.

222.    Nick Leet was not adequately warned by Defendants of the inherent risks, dangers, or hazards of becoming addicted to DFE, was not adequately warned that DB could not deter him from huffing, was not adequately warned that he may have been unable to taste DB, and was not adequately warned that he could inhale a deadly quantity of DFE from the computer dusters due

to the presence of DB. As a direct, substantial, and proximate result of these negligent failures to warn, Nick Leet suffered personal physical injuries, including death.

223.    At all relevant times, Defendants expressly warranted that Ultra Duster, Dust Off, Endust and their private label versions of these computer dusters were safe, of merchantable quality, and adequately fit for use.

224.    At all relevant times, Defendants made these warranties through their websites, product labeling, and product descriptions, including public assurances of safety that were intended to create demand for their computer dusters.

225.    At all relevant times, Defendants encouraged retailers to sell their dusters in multi-packs and market them in high visibility end caps without regard for quantity of cans sold, despite knowing that foreseeable misuse of huffing was prevalent and that huffing was highly addictive and likely to lead to severe injury and/or death.

226.    At all relevant times, Defendants breached express warranties including that their dusters contained a bitterant to "help discourage inhalant abuse" or similar language when the Defendants knew that the bitterant did not and in fact would not deter abuse because it was added to the can in an insufficient quantity to act as a deterrent in the gas vapor phase and could not be detected at any level by a significant portion of the population.

227.    In addition, DB was an inappropriate choice of bitterant due to its dilating effect on the respiratory system.

228.    At all relevant times, Ultra Duster, Dust-Off, Endust and their respective private label computer dusters did not conform to Defendants' express warranties because they each contained a design defect rendering them unsafe and not reasonably fit. The "bittering agent" did

not work as intended or for its advertised purpose and posed a foreseeable risk of harm or death to consumers such as Nick Leet.

229.    Plaintiffs seek the full measure of relief as provided under the law, including damages for pecuniary and non-pecuniary losses, attorneys' fees and costs, and any other relief this Court deems just and proper.

## COUNT V:  WRONGFUL DEATH

230.    Plaintiff Stephanie Leet realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

231.    Plaintiff Stephanie Leet, Nick Leet's surviving spouse, and their minor daughter, Heidy Leet, are "heirs at law" of the decedent. As such, Stephanie Leet, individually and as next friend of Heidy Leet, brings this claim for wrongful death pursuant to K.S.A. § 60-1901 *et seq*.

232.    As a direct, substantial, and proximate result of Defendants' wrongful acts set out in Counts I, II, III, IV, VII, and VIII, Nick was injured and died.

114.    Consequently, Plaintiff Stephanie Leet and her minor daughter Heidy Leet have suffered damages in the form of pecuniary and nonpecuniary losses by reason of Nick's death which are attributable to the defective design of Defendants' products and Defendants' failure to warn of certain risks associated with their products, as described in this Complaint. These damages incurred by Plaintiff Stephanie Leet and her daughter include but are not limited to: mental anguish, suffering, bereavement; loss of society, companionship, comfort or protection; loss of marital care, attention, advice or counsel; loss of filial care or attention; loss of parental care, training, guidance or education; and expenses for caring for the deceased, including funeral costs.

233.    Plaintiff Stephanie Leet, individually and as Next Friend of Heidy Leet, seeks all available compensatory relief in an amount to be determined at trial and reasonable attorneys' fees and costs.

## COUNT VI: SURVIVORSHIP

234.    Plaintiff Frank Leet realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

235.    Plaintiff is the Administrator of the estate of Nick Leet, having been duly appointed by the District Court of Johnson County, Kansas, Probate Department. Thus, as the personal representative of Nick Leet's estate, Plaintiff Frank Leet brings this claim for survivorship pursuant to K.S.A. § 60-1801.

236.    As a direct, substantial, and proximate result of Defendants' wrongful acts set out in Counts I, II, III, IV, VII, and VIII, Nick was injured and died. Nick endured conscious pain and suffering after becoming addicted to Defendants' products until he died from Difluoroethane toxicity, incurred medical expenses related to hospitalization and rehabilitation treatment for his addiction, and incurred loss of income prior to his death.

237.    Had he lived, Nick could have brought an action against Defendants for strict products liability, negligence, and breach of warranty for his injuries described above. Pursuant to the Kansas Survival Statute, K.S.A. Section 60-1801, recovery for these injuries accrues to the legal representative of his estate, Plaintiff Frank Leet.

238.    Plaintiff Frank Leet seeks all available compensatory relief in an amount to be determined at trial and reasonable attorneys' fees and costs.

## COUNT VII: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

239.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

240.    By operation of law, Defendants, as manufacturers of Ultra Duster, Dust Off, Endust, and their private label versions of these computer dusters, impliedly warranted that the computer dusters were of merchantable quality and safe for personal or household use.

241.    An implied warranty of merchantability, contained in the U.C.C. § 2-314, has been codified in Kansas under K.S.A. § 84-2-314.

242.    At the point of sale, the dusters contained inherent design defects that rendered them unsuitable and unsafe for personal or household use.

243.    Defendants breached the implied warranty of merchantability in connection with the sale and/or distribution of the computer dusters at issue.

244.    As a direct and proximate result of Defendants' breach of implied warranty of merchantability, Plaintiffs have sustained damages in an amount to be determined at trial.

## COUNT VIII:  BREACH OF EXPRESS WARRANTY

245.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

246.    Defendants made express, written affirmations of fact or promise relating to Ultra Duster, Dust-Off, Endust, and their private label versions of these computer dusters, warranting that the dusters contained a bitterant which deters inhalant abuse. Specifically, Defendants warranted that their dusters contained a bitterant to "help discourage inhalant abuse" or other similar language.

247.    Defendants made these express warranties about product safety through websites, packaging and labeling to assuage retailer concern for rising inhalant abuse injuries and deaths and to keep their defective and unreasonably dangerous products on the shelves.

248.    In reality, the bitterant DB was not added at a concentration that would be an effective deterrent and was an inappropriate choice of bitterant in the first instance due to the inability of a broad swath of the population to taste it and due to the dilating effects DB has on the respiratory system.

249.    Defendants encouraged retailers to sell their dusters in multi-packs and market them in high visibility end caps without regard for quantity of cans sold, despite knowing that huffing was a prevalent and entirely foreseeable use of their products, due to the highly addictive nature of DFE, and even though the bitterant DB would not deter such use and could increase the risks of inhalation.

250.    Defendants' products did not conform to the express warranties made as to product safety.

251.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs have suffered pecuniary and other losses.

252.    Plaintiffs seek recovery of actual damages of an amount to be determined at trial and any other relief that is deemed proper and just.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.  An order declaring that Defendant AW Distributing's and Defendant AW Product Sales' actions in disseminating Ultra Duster and private labeled versions of Ultra Duster without a proper bitterant which would deter inhalant abuse; failure to

adequately warn of the addictive nature of inhaling Ultra Duster and its private label counterparts; and/or failure to adequately warn the public about the inadequate nature of the bitterant contained within Ultra Duster and its private labeled counterparts:

i.  Are strictly liable as a "product seller," including a manufacturer, who sells any product in a defective condition unreasonably dangerous to the user or consumer which thereby causes physical harm, including under K.S.A. § 60-3301, *et seq.*;

ii.  Are strictly liable as a "product seller," including a manufacturer, who fails to prevent a product from being unreasonably dangerous by providing adequate warnings of known dangers that are not open and obvious, including under K.S.A. § 60-3301, *et seq.*;

iii.  Are negligent as a "product seller," including a manufacturer, for the negligent design of a product which causes that product to be unreasonably dangerous to the user or consumer and thereby causes physical harm, including under K.S.A. § 60-3301, *et seq.*;

iv.  Are negligent as a "product seller," including a manufacturer, for the negligent failure to warn of known risks or hazards which make the product unreasonably dangerous to the user or consumer and thereby causes physical harm, including under K.S.A. § 60-3301, *et seq.*;

v.  Violated the Kansas wrongful death statute, K.S.A. § 60-1901 *et seq.*, which provides for compensatory relief of pecuniary, nonpecuniary, and other damages to an heir at law of the deceased who sustains a loss by reason of the death;

vi.   Violated the Kansas Survival Statute, K.S.A. § 60-1801, *et seq.*, which provides for compensatory relief of pecuniary, nonpecuniary, and other damages to the legal representative of the decedent's estate for such damages incurred by the decedent prior to death;

vii.  Breached the implied warranty of merchantability;

viii. Breached their express warranties; and

ix.   A violation of K.S.A. Section 60-1901, which provides for compensatory relief of pecuniary, nonpecuniary, and other damages to an heir at law of the deceased who sustains a loss by reason of the death.

B.  An order declaring that Defendant Falcon's actions in disseminating Dust Off and private label versions of Dust Off without a proper bitterant which would deter inhalant abuse; failure to adequately warn of the addictive nature of inhaling Dust Off and its private label counterparts; and/or failure to adequately warn the public about the inadequate nature of the bitterant contained within Dust Off and its private label counterparts:

i.   Are strictly liable as a "product seller," including a manufacturer, who sells any product in a defective condition unreasonably dangerous to the user or consumer which thereby causes physical harm, including under K.S.A. § 60-3301, *et seq.*;

ii.  Are strictly liable as a "product seller," including a manufacturer, who fails to prevent a product from being unreasonably dangerous by providing adequate warnings of known dangers that are not open and obvious, including under K.S.A. § 60-3301, *et seq.*;

iii.  Are negligent as a "product seller," including a manufacturer, for the negligent design of a product which causes that product to be unreasonably dangerous to the user or consumer and thereby causes physical harm, including under K.S.A. § 60-3301, *et seq.*;

iv.  Are negligent as a "product seller," including a manufacturer, for the negligent failure to warn of known risks or hazards which make the product unreasonably dangerous to the user or consumer and thereby causes physical harm, including under K.S.A. § 60-3301, *et seq.*;

v.  Violated the Kansas wrongful death statute, K.S.A. § 60-1901 *et seq.*, which provides for compensatory relief of pecuniary, nonpecuniary, and other damages to an heir at law of the deceased who sustains a loss by reason of the death;

vi.  Violated the Kansas Survival Statute, K.S.A. § 60-1801, *et seq.*, which provides for compensatory relief of pecuniary, nonpecuniary, and other damages to the legal representative of the decedent's estate for such damages incurred by the decedent prior to death;

vii.  Breached the implied warranty of merchantability;

viii.  Breached their express warranties; and

ix.  A violation of K.S.A. Section 60-1901, which provides for compensatory relief of pecuniary, nonpecuniary, and other damages to an heir at law of the deceased who sustains a loss by reason of the death.

C.  An order declaring that Defendant Norazza's actions in disseminating Endust and private label versions of Endust without a proper bitterant which would deter inhalant

abuse; failure to adequately warn of the addictive nature of inhaling Endust and its private label counterparts; and/or failure to adequately warn the public about the inadequate nature of the bitterant contained within Endust and its private label counterparts:

i.    Are strictly liable as a "product seller," including a manufacturer, who sells any product in a defective condition unreasonably dangerous to the user or consumer which thereby causes physical harm, including under K.S.A. § 60-3301, *et seq.*;

ii.   Are strictly liable as a "product seller," including a manufacturer, who fails to prevent a product from being unreasonably dangerous by providing adequate warnings of known dangers that are not open and obvious, including under K.S.A. § 60-3301, *et seq.*;

iii.  Are negligent as a "product seller," including a manufacturer, for the negligent design of a product which causes that product to be unreasonably dangerous to the user or consumer and thereby causes physical harm, including under K.S.A. § 60-3301, *et seq.*;

iv.   Are negligent as a "product seller," including a manufacturer, for the negligent failure to warn of known risks or hazards which make the product unreasonably dangerous to the user or consumer and thereby causes physical harm, including under K.S.A. § 60-3301, *et seq.*;

v.    Violated the Kansas wrongful death statute, K.S.A. § 60-1901 *et seq.*, which provides for compensatory relief of pecuniary, nonpecuniary, and other

damages to an heir at law of the deceased who sustains a loss by reason of the death;

    vi.    Violated the Kansas Survival Statute, K.S.A. § 60-1801, *et seq.*, which provides for compensatory relief of pecuniary, nonpecuniary, and other damages to the legal representative of the decedent's estate for such damages incurred by the decedent prior to death;

    vii.    Breached the implied warranty of merchantability;

    viii.    Breached their express warranties; and

    ix.    A violation of K.S.A Section 60-1901, which provides for compensatory relief of pecuniary, nonpecuniary, and other damages to an heir at law of the deceased who sustains a loss by reason of the death.

D.  A judgment awarding Plaintiffs all appropriate damages to be determined at trial;

E.  A judgment awarding Plaintiffs pre-judgment and post-judgment interest in an amount prescribed by law;

F.  A judgment awarding Plaintiffs costs and fees, including attorneys' fees, as prescribed by law; and

G.  Grant such other legal, equitable, or further relief as the Court may deem just and proper.

H.  Plaintiffs request a trial by jury for all issues so triable.

RESPECTFULLY SUBMITTED, this the __ day of _____.

BY:    /s/ Rex A. Sharp

REX A. SHARP, KS #12350
RUTH ANNE FRENCH-HODSON, KS #28492
ALLISON B. WATERS, KS #28467
Sharp Law, LLP
4820 W. 75th St.
Prairie Village, KS 66208
Telephone: (913) 901-0505
Facsimile: (913) 901-0419
rsharp@midwest-law.com
rafrenchhodson@midwest-law.com
awaters@midwest-law.com

*Counsel for Plaintiffs*